# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION AT COVINGTON

**CIVIL ACTION No. 2:15-CV-160 (WOB-CJS)**

**BRANDON FREEMAN ET AL.**                    **PLAINTIFFS**

**VS.**              <u>**MEMORANDUM OPINION AND ORDER**</u>

**DELTA AIRLINES, INC ET AL.**             **DEFENDANTS**

This proposed class action was brought by six plaintiffs, all of whom are African-American and are or at one time were part-time employees of Delta Airlines in the "underwing" baggage handling department at the Cincinnati-Northern Kentucky International Airport ("CVG"). They allege that the manager and several supervisors over this particular department engaged in systemic racial discrimination in (a) disciplinary matters and (b) work assignments, resulting in a disproportionately lower number of African-Americans occupying higher paying positions. Plaintiffs seek to vindicate the rights of roughly thirty-six (36) part-time African-American baggage handlers at CVG.

Under 42 U.S.C. § 1981, Title VII, 42 U.S.C. § 2000e *et seq.*, and KRS § 344.010 *et seq.*, Plaintiffs assert the following five counts:

**Count I:**     Hostile work environment and racial harassment;

**Count II:**    Discrimination based on disparate impact and disparate treatment;

**Count III:**   Retaliation;

**Count IV:**   Race discrimination; and

**Count V:**   Punitive damages.

Plaintiffs demand front and back pay in connection with punitive damages, a declaratory judgment, and a permanent injunction against Defendants' alleged practices. (Doc. 5, ¶ 38).

This matter is before the Court on Plaintiffs' motion to certify the case as a class action (Doc. 52). The Court previously heard oral argument on the parties' motions and took the matter under submission. (Doc. 92). For the reasons that follow, Plaintiffs' motion for class certification is DENIED.

## FACTUAL AND PROCEDURAL BACKGROUND

In this case, the Court is presented with an expansive record that encompasses thousands of pages of deposition testimony and exhibits. Unlike a 12(b)(6) motion, when deciding a motion for class certification a "district court should not merely presume that the plaintiffs' allegations in the complaint are true." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012). "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted).[1] Here, the specifics of the named Plaintiffs' various anecdotal

---

[1] *See also* 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.82(2)

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

accounts of discrimination are largely irrelevant to the issue of certification now before the Court.

Therefore, in order to focus on those facts that are critical to the requirements for certification without sacrificing the context and underlying basis for Plaintiffs' lawsuit, the factual background below is primarily drawn from the Amended Complaint.

## A.   General Background

### i.   Overview of Ready-Reserve Employees

This class action lawsuit involves Delta Airlines, Inc.'s ("Delta") "Ready-Reserve" employees located at CVG in Hebron, Kentucky. (Doc. 52 at 1; Doc. 5, ¶¶ 16–21, 26). At CVG, Ready-Reserve employees are part-time members of Delta's Department 120, the "underwing" operations, which includes baggage handlers, ground equipment maintenance workers, and ramp employees. (Doc. 60 at 2; Doc. 63, Perdue Dep. at 49). Ready-Reserve employees primarily assist during peak flight schedules. (Doc. 73-1, Jones Dep. at 63–64).

All of the named Plaintiffs were hired and worked in Department 120 on a part-time basis. (Doc. 5, ¶¶ 16–21). Due to the limited hours afforded Ready-Reserve employees and the attendant benefits,[2] Plaintiffs' employment with Delta served as

_____

(Matthew Bender 3d ed. 2018) [hereinafter "MOORE'S"].

[2] Ready-Reserve employees are "hours-limited" meaning that they must work a minimum of 600 hours, but no more than 1400 hours yearly, are compensated at a

a second part-time job. (Doc. 69, Freeman Dep. at 44; Doc. 66, Vincent Dep. at 42, 44; Doc. 74, Lackey Dep. at 62–63).[3]

### ii.    Department 120 Management & Reporting Structure

A single Department Manager oversees Department 120. (Doc. 69, Freeman Dep. at 88–89); (Doc. 5, ¶ 7). Subordinate to the Department Manager are the Performance Leaders (Defendants Dale Unkraut, Marvin "Doug" Howe, David Gosney, Jimmy Davis, and others not named in this lawsuit) that directly supervise line employees and comprise the first line of recognizing and addressing disciplinary and work assignment issues. (Doc. 73, Jones Dep. at 67–68); (Doc. 5, ¶ 8).

During the time-period in quesiton, the Department Manager position was filled by at least two individuals. An individual identified as "Denny" acted as the Department Manager for part of the time, (Doc. 69, Freeman Dep. at 88–89), until Defendant Charles Jones took over in 2013 or 2014. *Id.*; (Doc. 73, Jones Dep. at 27–

---

fixed wage, and receive one incremental increase after six-months' employment. *Id.* They do not receive healthcare benefits from Delta but are awarded "pass privileges" allowing them to travel on Delta flights when there is availability. (Doc. 73-1, Jones Dep. at 33; Doc. 63, Perdue Dep. at 49–50).

[3] For example, Plaintiff Brandon Freeman is employed on a full-time basis as a fireman with the Cincinnati Fire Department and was a Ready-Reserve employee with Delta beginning on or about April 26, 2010 through June 23, 2014. (Doc. 1 at 6; Doc. 69, Freeman Dep. at 31). Fred Vincent's full-time position is as a police officer with the Cincinnati Police Department. (Doc. 66, Vincent Dep. at 13–14); (Doc. 5, ¶ 17). He was hired by Delta in 2010 as a Ready-Reserve employee in Department 120 and is still employed in that capacity on a part-time basis. (Doc. 5, ¶ 17).

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

28). Likewise, the number of performance leaders has fluctuated over time. Beginning in 2013, approximately fourteen (14) or fifteen (15) Performance Leaders were employed in Department 120. *Id.* at 68. Over time, the number of Performance Leaders dwindled to six (6) or seven (7). *Id.* at 84.

## B. Alleged Racial Discrimination Across the Class

There are six named African-American plaintiffs in this action, each of whom has raised allegations of systemic racial bias within Department 120. Plaintiffs allege they were discriminated against in at least four discrete ways: (1) disparate disciplinary measures, (2) less favorable work assignments, (3) a hostile work environment, and (4) retaliation for complaining of discrimination and filing EEOC charges. *E.g.*, (Doc. 5, ¶¶ 1–2, 24, 36, 48, 124); (Doc. 52-1 at 1).

The allegations related to two of these categories are particularly relevant for purposes of Plaintiffs' motion to certify two subclasses, one covering disciplinary matters and the other covering disparity in work assignments. (Doc. 52-1 at 1).

### 1. Disciplinary Matters

Plaintiffs allege in broad terms that management personnel "disproportionately disciplined" African-American Ready-Reserve employees—that is "more frequently and more severely"—as compared to Caucasian employees. *See, e.g.*, (Doc. 5, ¶¶ 34, 48, 56). Plaintiffs also state that they were "written up on several occasions for alleged minor offenses, while [they] observed white employees committing the same alleged offenses go free . . . or be punished less severely." (Doc.

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

5, ¶¶ 56, 102, 114, 116, 140, 152). Plaintiffs make clear that this "is not to say that white employees were not also disciplined"; but rather "black employees, would be disciplined for more minor transgressions (or sometimes without any support), and with more frequency . . . than their white counterparts." *Id.*

Because an employee that is subject to discipline may be disqualified from advancing or being promoted to a vacancy at Delta, *see id.* at ¶¶ 46, 48, Plaintiffs allege that "[t]he white managers and supervisors manipulate the [disciplinary] system . . . so that white employees receive better job assignments and better opportunities for advancement and compensation increases." *Id.* at ¶ 30. Plaintiffs further assert that "white employees have advanced and continue to advance or transfer more rapidly to better and/or higher paying non-exempt jobs than do African-American employees." *Id.* at ¶¶ 30–31. As a result, Plaintiffs claim they were denied the opportunity for a promotion or transfer because they were ineligible by virtue of being under some form of discipline, *id.* at ¶¶ 107, 109, 143, 158, 160, or were otherwise "denied several raises given to other employees not on discipline." *Id.* at ¶¶ 57, 103, 118, 141, 153.

## 2.  Work Assignments

Plaintiffs also allege that job tasks were assigned with racial animus toward African-American employees. (Doc. 5, ¶ 48). In general terms, Plaintiffs allege that African-Americans employed on a part-time basis in Department 120 are routinely "assigned disproportionately to service larger jets," which is a "more difficult" task

because these flights involve a greater number of bags, each of which is larger and heavier. *Id.* at ¶ 55. As further examples, Plaintiffs allege they were "assigned with other minority employees to work the ramp in inclement weather, while white employees [were] permitted to remain in the break room" and "black and minority employees" were required to "work an entire shift, while white employees [were] permitted to leave early." *Id.* at ¶¶ 55, 101, 113, 130, 139, 151.

### C.     Specific Allegations by the Individual Class Representatives

In support of their own claims and class certification, each of the named Plaintiffs describes instances of alleged discrimination.

#### i.     Plaintiff Brandon Freeman

Freeman's allegations are by far the most detailed and unique. Freeman began working in Delta's ground operations at CVG on April 26, 2010. (Doc. 5, ¶¶ 16, 54). In 2012, Freeman began a romantic relationship with a Caucasian employee at Delta, Michelle Race. *Id.* at 58. Freeman alleges that disapproval of interracial relationships was expressed by Manager Jones, Greg Kuhn (a member of Delta's corporate security), and supervisors Howe, Gosney, Unkraut, Lavalie,[4] and Martinez.[5] This included probing questions as to whether Race's relationship with Freeman was sexual in nature, racist remarks about African-American men, and threats of

---

[4] Lavalie is not a Defendant in this matter.

[5] Martinez is not a Defendant in this matter.

termination toward Race in order to obtain her cooperation in falsifying: (i) employment disciplinary charges and (ii) a police report against Freeman. *Id.* at ¶¶ 9, 59–75, 77.[6]

In October 2013 after Freeman had changed shifts with Race, he was placed on suspension, without pay, for "improper computer usage in relation to the shift swaps." *Id.* at ¶¶ 71–71, 78. Freeman appealed the disciplinary action through Delta. *Id.* at ¶ 80. Jones and Unkraut allegedly coerced a statement from Race implicating Freeman in the misconduct by threatening Race with the ultimatum of loss of her job. *Id.* at ¶ 82. When Race divulged that she had been coerced, Delta reinstated Freeman, but without back pay. *Id.* at ¶ 84.

Later, on about April 23, 2014, Freeman placed a bag on a flight to Atlanta for a co-worker at that location, but Freeman did not make the flight because he was unable to get his shift covered. *Id.* at ¶¶ 87–90. Supervisor Howe believed Freeman had shipped drugs on the flight. *Id.* at ¶ 91. Jones recommended in a letter that Freeman be terminated. (Doc. 73-1 at 144). An HR manager reviewed the recommendation and concurred, making a recommendation to the Sr. HR Manager, *id.* at 97, after which the Director of Delta's HR decided to terminate Freeman's employment. *Id.* at 96. On May 14, 2014, Freeman's employment was terminated for

---

[6] Freeman also asserts that Jones coerced Plaintiff Lackey to make a false statement about Freeman in order to avoid discipline. After Lackey did so, Freeman was suspended for 10 days. (Doc. 5, ¶ 76).

"pass abuse." (Doc. 5, ¶ 92).[7]

Freeman, however, claims the reason for his termination was pretextual because flight pass offenses "almost never result in termination at Delta." *Id.* As a result, in July 2014, Freeman filed charges with the Equal Opportunity Employment Commission ("EEOC"). *Id.* at ¶ 94; (Doc. 69-1 at 39). Race also later filed a separate EEOC charge alleging retaliation and intimidation. (Doc. 5, ¶ 97).

### ii.    Plaintiff Fred Vincent

On May 11, 2010, Vincent began work with Delta in its ground operations at CVG. (Doc. 5, ¶ 17). In addition to having been called racial epithets, *id.* at ¶¶ 108–09, Vincent recounts being written up for a so-called "sick call" violation, whereas Caucasian employees "were not written up for missing more time off of work." *Id.* at ¶ 106. Vincent was placed on probation and was thus ineligible for a promotion or a raise. *Id.* at ¶ 107.

Vincent later spoke with Paul Baird, Delta's Regional Director at CVG, and Baird ultimately decided to give Vincent a clean slate by removing Vincent's probationary letter from his file.  (Doc. 66, Vincent. Dep. at 110); (Doc. 5, ¶ 109). Nevertheless, Vincent filed discrimination charges with the EEOC in July 2014. (Doc. 66-1 at 18).

---

[7] Freeman appealed his employment termination but this was denied in December 2014. (Doc. 5, ¶ 93).

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

### iii. Plaintiff Nicole Lackey

Lackey's employment with Delta in its ground operations at CVG began on November 15, 2010. (Doc. 5, ¶¶ 18, 112). She allegedly was directly discriminated against by Defendants Howe, Unkraut, Gosney, and Davis under the direction of Defendant Jones. *Id.* at ¶ 120. Specifically, starting in May 2011, Lackey alleges she was the subject of a series of disciplinary actions, in which she was "written up for one tardy and six sick call-offs" by supervisor Howe. *Id.* at ¶ 115. Lackey takes issue with the discipline she received because she allegedly produced a doctor's note in each instance and the same conduct by Caucasian employees "did not result in the same (or any) discipline." *Id.*

Then, Lackey was written up by a different supervisor, Defendant Gosney, for being late in June 2011 and again on September 3, 2011, the latter of which resulted in Lackey being placed on probation. *Id.* at ¶ 116. Lackey does not contend that she was not late on these occasions. Instead, she avers that two Caucasian employees repeatedly failed to report to work without calling, and yet there was no consequence. *Id.* at ¶ 117.

Lackey also asserts that she witnessed racially discriminatory statements being made to others. For example, two lower-level supervisors (neither of whom are Defendants in this matter), allegedly stated to Plaintiff Tall "can't you black women do anything about your odor" and "all blacks have trouble with the law." (Doc. 5, ¶ 121). Lackey also avers that African-Americans are "routinely screamed at and

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

verbally harassed on a weekly basis by co-workers or supervisors," and the same is not true for Caucasian employees. *Id.* at ¶ 123.

Lackey filed EEOC charges on July 9, 2014, after which she claims Defendants Jones, Howe, Unkraut, Gosney, Davis, and other Caucasian employees who were encouraged and emboldened by management increased their verbal harassment in retaliation. *Id.* at ¶¶ 122, 124. Lackey also maintains that another co-worker, who is not a party to this case, retaliated against her by turning up the rate of speed on the bag loader while Lackey was working on the ramp, causing her to injure her shoulder and undergo surgery. *Id.* at ¶ 125. Defendant Gosney, Lackey alleges, misreported the incident to cover up the retaliatory conduct. *Id.* at ¶ 126.

### v.      Plaintiff Aminata Tall

On November 13, 2012, Tall was hired by Delta to work in ground operations at CVG. (Doc. 5, ¶ 19). Beginning in November 2013 through January 2014, Tall alleges she was questioned about her "smell" by supervisor Davis. Tall complained to Davis that the comments were racially motivated, but Davis allegedly brushed off the accusations and boasted about his comments to other co-workers. *Id.* at ¶ 131.  This was purportedly the impetus that caused a co-worker by the name of Eric to later state to Tall, "Girl, your black ass always stinks." *Id.*

Tall filed EEOC charges on July 9, 2014. *Id.* at ¶ 132; (Doc. 64-1 at 13). Tall subsequently suffered a work-related injury. As retaliation for filing the EEOC charges, Tall claims Delta denied her reasonable accommodations and discontinued

her workers' compensation benefits in February 2015. *Id.* at ¶¶ 133, 135.

### vi.    Plaintiff Kenny Gaines

Gains was hired by Delta on October 11, 2010, to work in ground operations at CVG. (Doc. 5, ¶ 21). Gaines recounts being (a) placed on six months' probation for taking off his safety boot to remove a piece of metal, (b) written up and placed on two years' probation for having a cellular phone on the ramp, and (c) written up for being a few minutes late, whereas Caucasian employees with "similar issues" were not disciplined. *Id.* at ¶¶ 142–44.

Gaines further alleges that in 2013, Howe and Unkraut "attempted to blame him" for improperly lowering a belt loader and damaging an aircraft because these particular supervisors had "learned that a white female employee had actually been responsible." *Id.* at ¶ 145. Gaines also claims that Howe and Unkraut, have commented that "all you guys look alike," referring to African-American employees. *Id.* at ¶ 146.

Gaines also filed his EEOC charges on July 9, 2014. (Doc. 62-1 at 20). Gaines then applied for and was granted a location transfer and now works in Atlanta. (Doc. 5, ¶ 147–48).

### vii.    Plaintiff David Perdue, Jr.

Purdue's employment with Delta in ground operations at CVG began on February 20, 2012. (Doc. 5, ¶ 20). Purdue asserts that on one occasion he had accidentally double-booked himself for two shifts and attempted to remedy the

situation, as permitted by Delta, by trading shifts with another employee. When the employee arrived for Purdue's shift, supervisor Unkraut allegedly sent him home and issued Perdue a write up for "reliability" because the shift was not covered. *Id.* at ¶ 154. Purdue asserts that this was done because of his race, as he claims Unkraut later permitted Perdue to trade shifts with a Caucasian employee so that the individual could avoid discipline. *Id.*

As another example, Purdue recalls an instance where supervisor Ukraut posted the late schedule, which indicated that Perdue could take Paid Time Off ("PTO"). Believing that Unkraut might discriminate against him because it was allegedly "Unkraut's regular practice to let white employees, but not black employees leave early," Perdue took a picture of the schedule and then ended his shift early and took the PTO. *Id.* at ¶ 155. The next morning, Perdue learned that Unkraut had submitted a disciplinary action against him for leaving without permission. The morning supervisor showed Perdue the schedule, which read, "NO PTO." Perdue presented the supervisor with the photograph he had taken of the schedule, but he was nevertheless disciplined. *Id.*

Purdue also avers that he was written up by supervisor Howe "on one or two occasions for being late." *Id.* at ¶ 156. Purdue allegedly told Howe that he believed "he was being written up because he was black," to which Howe responded, "that he would also be writing up a white employee that same day, for being late by approximately 15 minutes." Purdue, however, claims that the particular employee

had previously been late approximately twenty times without repercussion. *Id.*

Finally, Purdue alleges he was written up for taking sick leave four times during one year, but "white employees with twelve or more sick time absences were not disciplined." *Id.* at ¶ 157. Moreover, Purdue claims supervisors Howe and Unkraut have made comments that "all you guys look alike," again referring to African-Americans. *Id.* at ¶ 159.

Purdue also filed EEOC charges in July 2014. (Doc. 63-1 at 28). Each of the named Plaintiffs candidly admits that "[a]fter the EEOC charges" were filed "in the summer of 2014, Delta did take certain remedial measures," allegedly known as the "Brandon Freeman" rules within Delta, "which partially alleviated certain [aspects] of the systemic discrimination." *E.g.*, (Doc. 5 at 29 n.5, 31 n.6, 32 n.7, 35 n.8, 41 n.13).

In 2014, Purdue applied for and was ultimately awarded a transfer to Delta's location in Atlanta. *Id.* at ¶ 160–61.

### D. Procedural History

As noted, each of the named Plaintiffs filed EEOC charges in July 2014. On approximately June 22, 2015, Plaintiffs received Right to Sue letters from the EEOC. (Doc. 5, ¶ 4). Plaintiffs filed this action on September 3, 2015, (Doc. 1), and then filed an Amended Complaint on September 10, 2015. (Doc. 5).

After over a year and five months of discovery, which included requests to extend the initial one-year period of discovery, (*e.g.*, Docs. 23, 46, 59), on January 2, 2018, Plaintiffs moved for class certification. (Doc. 52).

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

## ANALYSIS

### I.   Class Certification

"A district court has broad discretion to decide whether to certify a class." *Glazer v. Whirlpool Corp.* (In re *Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*), 722 F.3d 838, 850 (6th Cir. 2013). To obtain certification, the class must satisfy all four prerequisites under Federal Rule of Civil Procedure 23(a)[8]—numerosity, commonality, typicality, and adequate representation—and fit within one of the three types of class actions listed in Rule 23(b). *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012). As the "party seeking class certification," Plaintiffs have "the burden to prove the Rule 23 certification requirements." *Id.*

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate [their] compliance with the Rule—that is, [they] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350. As such, a formulaic recitation of the rule's language will not suffice; there "must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled." *Young*, 693 F.3d at 597 (citation and internal quotation marks omitted).

---

[8] The four requirements under Rule 23 are as follows: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

To ensure each requirement is satisfied, the Supreme Court and the Sixth Circuit have repeatedly instructed trial courts to engage in a "rigorous analysis." *Glazer*, 722 F.3d at 851–52 (citing *Dukes*, 564 U.S. at 350–51)); *Clemons v. Norton Healthcare Inc.*, 890 F.3d 254, 280 (6th Cir. 2018); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012).

In determining whether certification is appropriate, "it may be necessary for the court to probe behind the pleadings," and the analysis may "entail some overlap with the merits of the plaintiff's underlying claim" or involve "considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Dukes*, 564 U.S. at 350–51. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). The question is not "who will prevail on the merits, but rather whether the proposed class and class representative[s] meet the requirements for certification under Rule 23(a) and (b)." 5 MOORE'S § 23.84(1).

Plaintiffs in this case have failed to establish several of the requirements for class certification, including class representative standing; commonality; typicality; and adequacy-of-representation, and the Court is not convinced that certification would be appropriate under either Rule 23(b)(2) or (b)(3) .

### 1.    Implicit Rule 23 Requirements

Although Rule 23 is silent on the issue, before a class may be certified it is

axiomatic that (1) "the class must be susceptible of precise definition" and (2) the class representative(s) must be "member[s] of that class." 5 MOORE'S § 23.21(1). Plaintiffs satisfy only first requirement here.

### a. Class Definition

The class must be *identifiable*, not "amorphous" or "imprecise." 5 MOORE'S § 23.21(1). "For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Young*, 693 F.3d at 538 (citation omitted). Objective criteria include damages, injuries caused by a particular wrongful action, and fixed geographic boundaries. *Id.*

A class may also be divided into defined subclasses. Fed. R. Civ. P. 23(c)(4)–(5). Each subclass, however, "must independently satisfy the class action requirements of Rule 23 before it may be certified." 5 MOORE'S § 23.86(c); *see Sprague v. GMC*, 133 F.3d 388, 397 (6th Cir. 1998). "If a subclass does not meet one or more of the requirements of Rule 23, the court must deny certification as to that subclass." 5 MOORE'S § 23.86(c).

Here, Plaintiffs seek to certify the following two subclasses:

(1)    The first sub-class, relating to **disciplinary** matters, consists of all African-American Ready Reserve employees of Department 120 (the baggage handling or underwing operations) who were employed by defendant Delta . . . at [CVG] from September 3, 2010, to December 31, 2016, [and] who had any discipline imposed on them. [hereinafter the "disciplinary subclass"].

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

17

> (2)     The second sub-class, relating to **work assignments**, consists of all African-American Ready Reserve employees of Department 120 . . . who were employed by Delta at CVG, from September 3, 2010, to September 3, 2015. [hereinafter the "work assignment" subclass].

(Doc. 52-1 at 8).

Plaintiffs' subclasses are defined by clear objective criteria. Membership in the subclasses is determined based on the following objective facts: the employer; the employee's race; the employee's position at Delta; the existence of workplace discipline; and the relevant time period. Plaintiffs have also successfully avoided the common pitfall of defining the scope of the class according to a merits inquiry, *e.g.*, whether an individual was treated "fairly" or "constitutionally." 5 MOORE'S § 23.21(c); *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 895 (7th Cir. 2012) (concluding that a proposed class impermissibly defined its members as persons who earned less "because of their race").

But there is one problem with the time period chosen for each subclass: the statute of limitations. In this case, the applicable statute of limitations bars any Title VII claim based on a discrete incident that occurred prior to September 12, 2013, and any § 1981 claims arising before September 3, 2011 are also barred.

The well-accepted rule is that "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974). Because Plaintiffs filed suit on

September 3, 2015, (Doc. 1), the Court works back from that date using the limitations period for each of Plaintiffs' claims.

***Title VII.*** Although there is no need for the unnamed class members to exhaust administrative remedies under Title VII, *see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8 (1975), "[Plaintiffs'] Title VII claims only cover discrete acts of discrimination that occurred within [a] 300-day period ***prior*** to the filing of [a] charge of discrimination." *Bacon v. Honda of Am. Mfg., Inc.*, 192 F. App'x 337, 341–42 (6th Cir. 2006) (citing *AMTRAK v. Morgan*, 536 U.S. 101, 113–15 (2002)); *Watson v. Ohio Dep't of Rehab. & Corr.*, 690 F. App'x 885, 889–90 (6th Cir. 2017); *see* 42 U.S.C. § 2000e-5(e)(1).[9]

The earliest EEOC filing was on July 9, 2014.[10] Thus, the class period for defining the class must be narrowed to September 12, 2013 through December 31, 2016 (for the disciplinary subclass) and September 3, 2015 (for the work assignment subclass). *Marquis v. Tecumseh Prods. Co.*, 206 F.R.D. 132, 169, 172 (E.D. Mich. 2002)

---

[9] The period is 300 days (as opposed to 180 days) where the plaintiff first initiates discrimination proceedings with a state or local agency. 42 U.S.C. § 2000e-5(e)(1). Although it is not clear whether Plaintiffs first filed with a state or local agency, Defendants agree the 300-day period applies, (Doc. 60 at 33), and a failure on the part of the EEOC to refer a charge to the appropriate State charging agency where there is a worksharing agreement in place is not held against the plaintiff. *Nichols v. Muskingum Coll.*, 318 F.3d 674, 678–79 (6th Cir. 2003).

[10] *See* (Doc.69-1 at 39; Doc. 63-1 at 28; Doc. 66-1 at 18; Doc. 61-1 at 20; Doc. 74-1 at 19; Doc. 64-1 at 13).

(narrowing class definition); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1442–43 (9th Cir. 1984) (holding that trial court correctly narrowed class definition).

***42 U.S.C. § 1981.*** The catch-all four-year statute of limitations in 28 U.S.C. § 1658 applies to claims brought under § 1981. *Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 382–83 (2004). Thus, the class period for these claims may go back only to September 3, 2011.

***Kentucky Law.*** The 5-year statute of limitations in KRS 413.120(2) applies to employment discrimination cases brought under the Kentucky Civil Rights Act. *Kentucky Comm'n on Human Rights v. Owensboro*, 750 S.W.2d 422, 422–23 (Ky. 1988). Plaintiffs seemingly applied this limitations period to all of the claims.

Finally, although the issue goes more to commonality and typicality, Plaintiffs candidly admit that "[a]fter the EEOC charges" were filed by Plaintiffs "in the summer of 2014, Delta did take certain remedial measures, known as the 'Brandon Freeman' rules within Delta . . . which partially alleviated certain [aspects] of the systemic discrimination." *E.g.*, (Doc. 5 at 29 n.5, 31 n.6, 32 n.7, 35 n.8, 41 n.13). A class member's claim that arose *before* the summer of 2014 can hardly be considered common or typical of the claims *after* the summer of 2014. An entirely different statistical analysis would be required to show a disparate impact, and this should be reflected in different subclasses.

At any rate, even as the class is currently defined, Plaintiffs' statistical evidence is insufficient to show a common practice of discrimination. *See infra* Part

I(2)(b)(i).

### b.     Class Representative Standing

To maintain a class action, the representatives of each class must have proper standing. 5 MOORE'S § 23.21(1). In order to have standing to sue as a class representative, the individual "must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Dukes*, 564 U.S. at 348 (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

It is proposed that the named Plaintiffs, except for Tall, will serve as representatives for the disciplinary subclass. (Doc. 52-1 at 10 n.15). All six of the named Plaintiffs will serve as representatives for the work assignment subclass. Although each of the named Plaintiffs is African-American; was employed by Delta within the relevant period; was stationed in Department 120 at CVG as a Ready-Reserve employee; and suffered a similar injury as potential class members in each respective subclass, (Doc. 5, ¶¶ 16–17, 19–21, 54–110, 128–62); (Doc. 64 at 82–84), they lack standing to represent the class.

The named Plaintiffs lack class representative standing because "[a] plaintiff cannot represent those having causes of action against other defendants against whom the plaintiff has no cause of action and from whose hands he suffered no injury. This is true *even though* the plaintiff may have suffered *an injury identical* to that of the other parties he is representing." *See, e.g.*, *Thompson v. Bd. of Educ. of Romeo Cmty. Schs.*, 709 F.2d 1200, 1204–1205 (6th Cir. 1983) (emphasis added); 5 MOORE'S

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

21

§ 23.24(6)(a).

Here, the alleged discriminatory discipline was at the hands of different supervisors (some who are not even defendants). Whether this is considered a defect in standing or an additional basis for why the typicality requirement has not been satisfied (*see infra* Part I(2)(c)), it is clear to the Court that class certification is improper.

### 2. Rule 23(a) Requirements

#### a. Numerosity

Rule 23(a)(1) requires that members of the class be "so numerous that joinder of all members is impracticable." Although there is "no strict numerical test for determining impracticability of joinder," In re *Am. Medical Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996), and an "examination of the specific facts of each case" should be conducted, *id.* (quoting *General Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980)), the Sixth Circuit has observed that "'substantial' numbers usually satisfy the numerosity requirement." *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). To establish that numerosity exists, however, "[t]he party seeking certification may not rely on conclusory allegations that joinder would be impracticable, or on mere speculation regarding the size of the class." 5 MOORE'S § 23.22(3); *Young*, 693 F.3d at 541 ("[I]mpracticability of joinder must be positively shown, and cannot be speculative." (citation omitted)).

Defendants erroneously conflate Rule 23 certification requirements with the

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

viability of Plaintiffs' underlying claims. Defendants spend a great deal of effort arguing that Plaintiffs cannot satisfy numerosity because the members of both subclasses lack viable claims. (Doc. 60 at 7–13). Specifically, Defendants maintain that the workplace discipline and job assignments at issue are not the types of "adverse employment decision[s]" necessary to sustain employment discrimination claims based on race. (Doc. 60 at 7, 11); *see White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). In other words, there is a common lack of proof as to an essential "element of [P]laintiffs' cause of action." *Amgen*, 568 U.S. at 470 (citation omitted).

That may very well be true. But "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. The class action ultimately "will prevail or fail in unison" depending on whether Plaintiffs establish the elements of their claims. *Glazer*, 722 F.3d at 859. As such, Defendants' end-run-around class certification "is properly addressed at trial or in a ruling on a summary-judgment motion." *Amgen*, 568 U.S. at 470. Therefore, the Court rejects Defendants' invitation to "turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Glazer*, 722 F.3d at 851–52 (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012)).

Turning then to the disciplinary subclass, Plaintiffs have satisfied numerosity. A leading treatise has collected cases and observed that: "A class of 20 or fewer is usually insufficiently numerous. . . . A class of 41 or more is usually sufficiently

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

23

numerous. . . . Classes with between 21 and 40 members are given varying treatment." 5 MOORE'S § 23.22(b).

Here, the sealed disciplinary records for Delta's Department 120 indicates that there were 36 African-American employees on some sort of discipline during the relevant time period. (Doc. 53-1).[11] The Court concludes that 36 members satisfies the numerosity requirement for the disciplinary subclass. *See Afro American Patrolmen's League v. Duck*, 503 F.2d 294, 298 (6th Cir. 1974) (holding that 35 class members satisfied the numerosity requirement).

Plaintiffs also have the requisite numbers in the work assignment subclass. Although there is no data for this subclass, (Doc. 52-1 at 6), as further evidenced by the fact that Plaintiffs' expert did not conduct a statistical analysis regarding work assignments, (Doc. 52-12, ¶ 1), the Court is entitled to draw reasonable inferences from the facts. In re *Am. Medical Sys.*, 75 F.3d at 1079.

Accordingly, because membership in the work assignment subclass is not predicated on having been disciplined, it follows that there are at least as many (and

---

[11] Using data from Delta, Plaintiffs' expert Dr. Horewitz reported that there were twenty (20) African-American Ready-Reserve employees in 2013 and twenty (20) in 2014, all of whom were disciplined in some way. (Doc. 52-12, ¶¶ 20–21). Plaintiffs leap to the conclusion that therefore there is at least 40 members in the disciplinary class. This is not so. The same 20 African-American Ready-Reserve employees in 2013 may well be (and in all likelihood are) the same 20 African-American Ready-Reserve employees on the roster for 2014. So to say that there is 40, rather than 20 or 27, is "mere speculation." 5 MOORE'S § 23.22(3); *Young*, 693 F.3d at 541.

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

perhaps more) members in the work assignments subclass as there are in the disciplinary subclass. Therefore, the numerosity requirement is satisfied for the work assignment subclass.

### b. Commonality

Rule 23(a)(2) requires Plaintiffs to prove that "there are questions of fact or law common to the class." Satisfying this requirement is not a matter of quantity, as "[e]ven a single [common] question will do." *Dukes*, 564 U.S. at 359 (citation and internal quotation marks omitted). But the quality of that question does matter. The common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve *an issue that is central* to the validity of each one of the claims *in one stroke*." *Dukes*, 564 U.S. at 350 (emphasis added); *Young*, 639 F.3d at 542. This requires more than the allegation that a group of claimants "have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350 (emphasis added). Because commonality and typicality are similar and "tend to merge," *Dukes*, 564 U.S. at 349 n.5, both requirements often are addressed together. *Young*, 693 F.3d at 542. Accordingly, the analysis below applies equally to the typicality requirement.

Plaintiffs believe commonality exists. Their theory is that Department 120 engages in a "common course of discrimination" thus adversely impacting the advancement, transfer, compensation, working assignments, and discipline for African-Americans. (Doc. 52-1 at 14); (Doc. 5, ¶¶ 24, 27, 34–35). More specifically,

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

Plaintiffs maintain that two discriminatory practices were prevalent in Department 120: (1) African-Americans were subjected to a disproportionate number of disciplinary measures due to unequal enforcement of the workplace rules; and (2) African-Americans were disproportionately required to handle less favorable work assignments and conditions. (Doc. 5, ¶¶ 24, 34, 48, 55); (Doc. 80 at 9–11).

In contending that commonality is present, Plaintiffs aver that the following common questions of law exist:

> (1) Whether Delta has engaged in unlawful, systemic race discrimination in its advancement, transfer, and discipline policies, practices and procedures, and in the general terms and conditions of work and employment;
>
> (2) Whether Delta is liable for a continuing systemic violation of Title VII and/or Section 1981 and/or Kentucky Chapter 344 claims; and
>
> (3) What are the proper standards for proving a pattern or practice of discrimination by Delta against its African-American applicants and employees at CVG?

(Doc. 52-1 at 14).

Plaintiffs argue the common questions of fact include:

> (1) Whether Delta has, through its policies, practices and procedures, precluded or delayed the advancement or compensation increases for African-Americans;
>
> (2) Whether Delta discouraged African-Americans from seeking promotions and/or transfers into jobs traditionally held by white employees;
>
> (3) Whether Delta has subjected African-Americans to a racially hostile work environment;
>
> (4) Whether Delta has generally segregated African-Americans into jobs

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

26

or working conditions or assignments that were disadvantageous as compared to white employees;

(5) Whether Delta has subjected African-Americans to disparate disciplinary policies, practices, and procedures;

(6) Whether Delta has systemically engaged in a cover up through shoddy and deliberately misleading internal investigations of the items at issue.

*Id.* at 14–15. Plaintiffs then summarily conclude that "the requirement of commonality is met." *Id.* at 15.

Plaintiffs have missed the mark. As the Supreme Court observed, "[r]eciting these [type of] questions is not sufficient to obtain class certification" because "[a]ny competently crafted class complaint literally raises common 'questions.'" *Dukes*, 564 U.S. at 349 (citation omitted). "What matters to class certification . . . is not the raising of common questions—even in droves—but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350 (citation and internal quotation marks omitted). "Conclusory allegations and general assertions of discrimination"—like those presented here—"are not sufficient to establish commonality." *Bacon v. Honda of Am. Mfg.*, 370 F.3d 565, 571 (6th Cir. 2004) (quoting *Falcon*, 457 U.S. at 157).

Thus, as in *Dukes*, the crux of the commonality inquiry here is "the reason for a particular employment decision." 564 U.S. at 352 (citation omitted). To that end, Plaintiffs must "produce a common answer to the crucial question *why was I disfavored.*" *Id.* (emphasis in original). They have not done that.

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

27

In employment discrimination class actions, the bar for satisfying commonality was raised by *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157–61 (1982) and *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352–60 (2011). Employees can no longer initiate an "across-the-board" lawsuit against an employer based on "an abstract policy of discrimination" coupled with the "mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin." *Falcon*, 457 U.S. at 159 & n.15; 5 MOORE'S § 23.23(4)(e). Thus, today "employment-discrimination class actions are appropriate only in those cases in which the plaintiffs assert that specific practices have had a common effect on both the class representatives and all putative class members." 5 MOORE'S § (4)(e). As the Court in *Dukes* reiterated:

> [T]here is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims.

*Dukes*, 564 U.S. at 352–53 (quoting *Falcon*, 457 U.S. at 157–58). *Dukes* echoed *Falcon* in noting that there are two ways a plaintiff can bridge that gap.

*First*, plaintiffs may assert "discriminatory bias on the part of the same supervisor," *Dukes*, 564 U.S. at 350, or adduce evidence that the employer "used a biased testing procedure to evaluate both applicants for employment and incumbent employees." *Id.* at 353 (quoting *Falcon*, 457 U.S. at 159 n.15). *Second*, as an

alternative, plaintiffs must come forward with "[s]ignificant proof that an employer operated under a general policy of discrimination . . . [and] the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes." *Id.* (quoting *Falcon*, 457 U.S. at 159 n.15).

The first option is inapplicable, as in *Dukes*, because Delta's Department 120 does not have a formal testing procedure or established criteria that discriminates on the basis of race. *Id.* The notion that Plaintiffs were subjected to bias at the hand of the same supervisor also has no application here. Although a single manager oversaw Department 120, one of two individuals held that position at different times during the relevant period between 2010–2016. (Doc. 69, Freeman Dep. at 88–89). And only one of those individuals, Jones, is a Defendant in this action. Nowhere do Plaintiffs allege that the other individual, "Denny," engaged in discriminatory practices during his tenure as manager of Department 120.

The gap in commonality is enlarged by the fact that management of Department 120 is decentralized—that is, there are lower-level Performance Leaders that have significant control over disciplining and assigning work to Ready-Reserve employees. (Doc. 5, ¶ 8; Doc. 73 at 67–68). This is supported by testimony from Freeman's friend, Race, who testified to the closing duties that she perceived as biased against African-Americans. In speaking of the supervisors, Race stated that "they all made the schedule. It just depend[ed] on who was working. That's who gave

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

29

the assignments." (Doc. 76 at 184–85). And significantly, the specific number of these Performance Leaders over the course of the relevant time period ranged from six to fifteen. (Doc. 73, Jones Dep. at 68, 84).

Moreover, in many of the specific incidents of discipline complained of by the named Plaintiffs, Jones evidently had little or no involvement. (Doc. 5, ¶ 8; *see id*. at 18–43). Rather, the discipline was primarily doled out by six different supervisors, and of those supervisors, two (Heringer and Dacek) are not defendants or even mentioned in the Complaint. (Doc. 60-1 at 1–3).

Plaintiffs' theory that a general policy of subjective discrimination existed is further undercut by the fact that many of the named Plaintiffs admit that several supervisors were not the problem. Plaintiff Vincent testified he "never had an issue" with LeValley or Defendant Howe. (Doc. 66 at 154–55). Plaintiff Tall testified she did not, or cannot remember having an issue with Defendants Howe, Unkraut, or Gosney. (Doc. 64 at 154–55). Plaintiffs Freeman and Gaines admit they had no complaints about Defendant Davis. (Doc. 69 at 116; Doc. 62 at 95), and Plaintiff Purdue did not even have any issues with Heringer or Defendants Davis and Gosney. (Doc. 63 at 81–82). Each Plaintiff's complaints are against different supervisors in Department 120, and out of all the supervisors in the department, it is clear that only a handful were involved in the alleged misconduct.

Therefore, when considering (a) the span of time involved (6 years), (b) the number of supervisors (6–15), (c) the various individuals that held each of those

positions over the years, and (d) the fact that several supervisors admittedly did not engage in discrimination, it cannot be said that a specific practice "had a common effect on both the class representatives and all putative class members." 5 MOORE'S § (4)(e).

That leaves the only other way for Plaintiffs to place the proposed class members under one umbrella: "[s]ignificant proof that [Delta's Department 120] operated under a general policy of discrimination . . . [and] the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes." *Dukes*, 564 U.S. at 353 (quoting *Falcon*, 457 U.S. at 159 n.15).

Here, the requisite proof is absent. Delta's written policies expressly forbid discrimination and harassment of any kind. (Doc. 73-1 at 1–10); *Dukes*, 564 U.S. at 353. As in *Dukes*, the only departmental policy Plaintiffs have identified here is Delta's "policy" of "allowing discretion by [Department 120] supervisors over employment matters." 564 U.S. at 355. But Plaintiffs must go beyond that. They must identify a uniform policy or practice "that guides *how*" management exercises its discretion, such that it "caused or contributed to the alleged disparate impacts." *Miller v. Countrywide Bank, N.A.* (In re *Countrywide Fin. Corp. Mortg. Lending Practices Litig.*), 708 F.3d 704, 708 (6th Cir. 2013). That is, "class members must unite acts of discretion under a single policy or practice, or *through a single mode of exercising discretion*, and the mere presence of a range within which acts of discretion

take place will not suffice to establish commonality." *Id.* at 708.

To make this showing, Plaintiffs rely on statistical and anecdotal evidence, and argue that the Department Manager and roughly 15 Performance Leaders of Department 120 employed a common discriminatory "mode of exercising discretion" to discipline and assign Ready-Reserve employees to specific tasks.

Plaintiffs' theory fails. They have merely pointed to a perceived disparity in the workplace and that is not enough.

### i. Plaintiffs' Statistical Evidence Involves Inapplicable Analyses Based on Insufficient Data.

The statistical evidence Plaintiffs offer is insufficient because their expert concedes as much. "Statistical evidence alone can suffice in a disparate impact case if it is of a kind or degree sufficient to correlate a specific employment or union practice with the complained-of adverse effect." *Bondurant v. Air Line Pilots Ass'n*, 679 F.3d 386, 394–95 (6th Cir. 2012); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988) ("[T]he plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has *caused* the [disparate impact]." (emphasis added)). The same degree of statistical proof is required to satisfy the commonality requirement. *See Miller*, 708 F.3d at 709–10. Thus, "[i]ncomplete or inapplicable analyses, simplistic percentage comparisons, and small sample sizes produce statistical analyses with little probative value." *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 485 (6th Cir. 2008) (citing *New York City Transit*

*Auth. v. Beazer*, 440 U.S. 568, 582–87 (1979); *Mayor of Phila. v. Educ. Equal. League*, 415 U.S. 605, 620–21 (1974)). Here, Plaintiffs' statistical proof is plagued by at least three flaws.

First, the data is incomplete. Plaintiffs' statistics expert, Dr. Horewitz, examined the data provided for African-American and non-African-American Ready-Reserve employees in Department 120 who were disciplined for tardiness and absenteeism. (Doc. 52-12, Ex. 1, Horewitz Rep., ¶ 1). But the only figures available were from 2013 and 2014. *Id.* at ¶ 15.[12] As such, Dr. Horewitz admitted—and Defendants' expert, Dr. Baker, confirmed—"The data provided by Delta to address this matter are insufficient to perform analyses that fully address the issue of differential discipline." *Id.* at ¶ 5; (Doc. 60-4, Ex. 1, Baker Rep. at 2). Indeed, Dr. Horewitz further concedes that she "cannot design a conclusive test for the presence

---

[12] Horewitz notes that "data for employees who departed more than three years ago is unavailable (including racial make-up and any disciplinary actions)" and therefore, Dr. Horewitz was "unable to draw conclusions" as to the time period before 2013 and only conducted a statistical analysis for 2013 and 2014. (Doc. 52-12, Ex. 1, ¶ 15). Yet despite the admitted deficiency in the data, Plaintiffs' expert somehow opines that the "analyses that can be performed with the available data are consistent with the Plaintiffs' allegations of differential discrimination." (Doc. 52-12, Ex. 1, ¶ 6). To reach that conclusion, Dr. Horewitz simply surmises that the disparity in discipline that is shown in the admittedly deficient data is "consistent with the anecdotal evidence in the complaint" and "with what I [Dr. Horewitz] expect should there be racial discrimination." *Id.* at ¶ 17. But Plaintiffs cannot simply extend the data beyond its limitations. They "must offer *statistical evidence* of a kind and degree sufficient to show that the practice in question has *caused* the [disparate impact]." *Watson*, 487 U.S. at 991 (emphasis added).

of racial discrimination." (Doc. 52-12, Ex. 1, ¶ 17).

Second, Plaintiffs' expert relied on a meager sample size. In Department 120, there were 69 Ready-Reserve employees in 2013 and 70 in 2014. *Id.* at 8. And in 2013 and 2014, respectively, there were only a mere 14 and 11 disciplinary corrective actions *for all Ready-Reserve employees in Department 120*. Moreover, Dr. Baker confirmed that industry practices render Plaintiffs' statistics unreliable. (Doc. 60-4, Ex. 1 at 2 n.5 ("I know of no 'industry practices in statistical analysis' (and Plaintiffs' expert did not cite any) that support the notion that conclusions drawn from analyses based on insufficient data are consistent with professional standards.").

Lastly, the analysis employed by Plaintiffs' expert is irrelevant. Plaintiffs' only statistical evidence pertains to a small sample size that scarcely indicates a disparity in workplace discipline among class members. But Plaintiffs have not shown on a classwide basis that the discipline allegedly dispensed with bias then *caused* class members to experience an adverse employment action. In other words, Plaintiffs have not shown that "the discrimination manifested itself in *hiring and promotion practices* in the same general fashion." *Dukes*, 564 U.S. at 353 (quoting *Falcon*, 457 U.S. at 159 n.15). Thus, the relevant data analysis—**and the one missing from Dr. Horewitz's report**—is a comparison of "the number of protected group members benefitting from promotions [or raises] with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group." *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (citing *Connecticut v. Teal*, 457 U.S. 440, 448

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

(1982)); *cf.* (Doc. 5, ¶¶ 30–31).

To be sure, evidence of a disparate impact in discipline is not enough. Plaintiffs must show a disparate impact in "employment status" because "discipline, whether warranted or not, do[es] not constitute a material adverse change in the terms of employment in the discrimination context." *Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 494 (6th Cir. 2017). The disciplinary measure must have "an adverse impact on an employee's wages or salary." *White*, 533 F.3d at 402. Plaintiffs, however, have offered no statistical evidence to address that issue.[13] As a result, a case-by-case fact-intensive inquiry is needed in this case to determine (1) whether race was a motivating factor for why a class member was disciplined or given a particular work assignment; and if so, (2) whether that disciplinary measure was the reason a particular class member was forced to forgo a promotion or a pay raise.[14] A class action is not the appropriate vehicle for such determinations.

---

[13] Plaintiffs acknowledge as much in their Reply brief as they proceed to *demonstrate* (*one by one*) that each of the named Plaintiffs later suffered economic loss as a result of some discipline they previously received. (Doc. 80 at 3–5).

[14] For example, Plaintiff Gaines must prove that he was disciplined for being late to work, taking off his safety boot, and talking on his cell phone on the ramp (and non-African-Americans were not) because race was a motivating factor. (Doc. 5, ¶ 142–44). Then Gaines must show that somehow he was deprived of a pay raise or promotion *because of* one or more of these infractions (rather than some other reason). This all goes to show that there is nothing "central to the validity of each one of [Plaintiffs'] claims" that will be resolved "in one stroke." *Dukes*, 564 U.S. at 350 (emphasis added); *Young*, 639 F.3d at 542.

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

35

Of course, this case involves an alleged discriminatory practice in one department of a company, unlike in *Dukes*, which involved a nationwide class action comprised of 1.5 million members. 564 U.S. at 342–43. But nothing in *Dukes* or its progeny permits a class of plaintiffs to maintain an across-the-board class action based on flawed statistical evidence. Therefore, given the insufficient data, small sample size, and inapplicable analysis, *Shollenbarger*, 297 F. App'x at 485, Plaintiffs' statistical evidence fails to show a common mode of discrimination as it relates to the disciplinary subclass. Consequently, the claims asserted cannot be adjudicated on a classwide basis.

For example, in Count II, Plaintiffs assert both disparate treatment and disparate impact claims.[15] To state a disparate treatment claim, a plaintiff must

---

[15] Courts have long distinguished between "disparate treatment" and "disparate impact" claims in employment discrimination.

> "Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics.] Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. . . .

> Claims that stress "disparate impact" [by contrast] involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive . . . is not required under a disparate-impact theory.

*Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993) (alterations in original) (quoting *Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15 (1977)).

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

36

show: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was . . . treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *see Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776–85 (6th Cir. 2016) (applying the burden-shifting framework to Title VII claim involving discriminatory discipline where defendant conceded the first three elements).

Plaintiffs have shown that the *only element* capable of classwide resolution is that all class members belong to the same protected class. This is problematic because Plaintiffs' claims involve a myriad of different disciplinary actions and work assignments that Plaintiffs contend were motivated by race. "Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*" *Dukes*, 564 U.S. at 352. This is so because, as discussed, Plaintiffs lack the requisite statistical evidence that normally serves as that "glue." *See Watson*, 487 U.S. at 994–96.

As to the working assignments subclass, Plaintiffs have *not offered any* statistical evidence to establish a disparity in the working assignments given to African-American Ready-Reserve employees. Plaintiffs' expert only examined disciplinary measures. (Doc. 52-12, Ex. 1, ¶ 1). Thus, it cannot be determined—on a classwide basis—whether Plaintiffs were assigned to an "unfavorable" working

assignment *because of* their race.

The Court therefore concludes that Plaintiffs' statistical evidence is insufficient to "unite acts of discretion" under "a single mode of exercising discretion," *Miller*, 708 F.3d at 708, in order to satisfy the commonality requirement.

### ii. Plaintiffs' Anecdotal Accounts, Without More, Cannot Support an Across-The-Board Theory of Discrimination.

Plaintiffs have only their anecdotal evidence left to support a finding that a common discriminatory "mode of exercising discretion" existed in Department 120. *Miller*, 708 F.3d at 708. But the problem is that Plaintiffs have not directed the Court to a case where an employment discrimination class action was certified based solely on anecdotal evidence. *See Dukes*, 564 U.S. at 358 (noting that in *Teamsters v. United States*, 431 U.S. 324 (1977), "***in addition to substantial statistical evidence*** of company wide discrimination," plaintiffs produced "roughly one [anecdotal] account for every eight members of the class." (emphasis added)). Although the six named Plaintiffs' anecdotes would be compelling evidence in each individual's case, it says nothing about an across-the-board claim of discrimination. *Falcon*, 457 U.S. at 159 ("If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a . . . class action."). In other words, Plaintiffs' anecdotal evidence does not resolve an issue "that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350; *Young*, 639 F.3d at 542.

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

Plaintiffs' hostile work environment claim (Count I)—which is premised entirely on anecdotal evidence—only confirms that class certification is inappropriate. To state a claim for a racially hostile work environment a plaintiff must demonstrate that:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011); *cf. Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (citations omitted). Plaintiffs must also establish that "the work environment was both subjectively and objectively hostile." *Smith v. Rock-Tenn Servs.*, 813 F.3d 298, 309 (6th Cir. 2016) (citing *Harris*, 510 U.S. at 21–22).

Determining whether a work environment meets the above criteria requires courts to "look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *AMTRAK v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris*, 510 U.S. at 23). Moreover, "[t]he standards for holding an employer liable under Title VII differ depending on whether the hostile work environment was created by an employee's coworkers or by a supervisor." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 n.2 (6th Cir. 2013) (citing *Vance v. Ball State Univ.*, 570 U.S.

421, 424 (2013)).

As the above legal standard demonstrates, Plaintiffs' hostile work environment claim is not susceptible to classwide adjudication because it involves a highly fact-intensive inquiry for each class member. *Elkins v. Am. Showa Inc.*, 219 F.R.D. 414, 423–424 (S.D. Ohio 2002) (finding that commonality cannot exist for a hostile work environment claim **brought by workers** *at a single plant*). For similar reasons, the same result obtains as to Plaintiffs' retaliation claim (Count III). *Elkins*, 219 F.R.D. at 425 (concluding that "Plaintiffs' *retaliation claims are even less conducive to class-wide adjudication* based on a lack of commonality among such claims" despite that the class involved workers *at a single plant*).

For all these reasons, Plaintiffs have failed to present "significant proof" of a uniform policy, practice, or mode of exercising discretion amidst the numerous acts of discretion related to discipline and working assignments that in turn led to the alleged disparity of African-American employees in higher paying positions within Department 120. Therefore, Plaintiffs have not met the commonality requirement under Rule 23(a)(2).

### c.    Typicality

Rule 23(a)(3) requires proof that Plaintiffs' claims are "typical" of the class members' claims. For the reasons stated as to why commonality is absent, Plaintiffs have also failed to show that typicality exists.

The typicality requirement is satisfied, "if the class representative's claims

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

40

arise from the same events, practice, or conduct, and are based on the same legal theory, as those of other class members." 5 MOORE'S § 23.24(2); *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007). But "the typicality requirement is not satisfied when a plaintiff can prove his own claim but not 'necessarily have proved any[one] else's claim.'" *Beattie*, 511 F.3d at 561 (quoting *Sprague*, 133 F.3d at 399).

It is patently clear that even if, for example, Plaintiffs Gaines or Freeman proved that racial animus was behind the disciplinary actions to which they were subjected, this does nothing to move the other class members' claims forward. *Dukes*, 564 U.S. at 355–56 ("[D]emonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's").

Typicality is also absent for an additional reason: There is not at least one named plaintiff with a claim against each defendant. "To meet the typicality requirement, there must be at least one class representative who has been injured by and has a claim against each and every defendant." 5 MOORE'S § 23.24(6)(a) & n.17 (citing *Thompson v. Bd. of Educ. of Romeo Cmty. Schs.*, 709 F.2d 1200, 1204–05 (6th Cir. 1983) (class not certified in sex discrimination suit because plaintiff was not injured by each of eight different defendants); *see also Liberte Capital Group, LLC v. Capwill*, 148 F. App'x 413, 417 (6th Cir. 2005).[16]

---

[16] The exceptions to the general rule are not applicable here because there is not an alleged conspiracy and the individual claims are not "juridically related" in such a way that a single resolution of the dispute is possible. *See Thompson*, 709 F.2d at

As detailed above, here, the employment decisions were made by various supervisors over the course of six years. *See also* 5 MOORE'S § 23.24(8)(e) ("[C]laims involving decentralized decision-making by the defendant do not satisfy typicality.").

The Court therefore concludes that the proposed class action does not satisfy Rule 23(a)(3).

### c.    Adequacy of Representation

To determine whether the adequacy-of-representation requirement under Rule 23(a)(4) is met, the Sixth Circuit looks to two criteria: (1) "the representative must have common interests with unnamed members of the class," and (2) "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Young*, 693 F.3d at 543 (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083). The first factor is not satisfied.

The Supreme Court has noted that the "adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (citation and internal quotation marks omitted); 5 MOORE'S § 23.25(f)(9)

---

1204–05.

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

42

(same). In light of the fact that each class member's claims will necessarily involve individualized factual and legal findings, it follows that the named Plaintiffs' claims and the class claims are ***not*** "so interrelated that the interests of the class members will be fairly and adequately protected in their absence."

Therefore, Rule 23(a)(4) has not been satisfied.

### 3. Rule 23(b)

"[E]ach class meeting [the] prerequisites [of Rule 23(a)] must also pass at least one of the tests set forth in Rule 23(b)." *Rikos v. P&G*, 799 F.3d 497, 509 (6th Cir. 2015) (alterations in original) (citation omitted). Here, Plaintiffs seek to certify the class under "Rule 23(b)(2) and/or 23(b)(3)." (Doc. 52-1 at 2, 8). Although the Court has concluded that Plaintiffs have not satisfied the requirements of Rule 23(a), the class also fails to satisfy either Rule 23(b)(2) or (b)(3).

### a. Rule 23(b)(2)

Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting *the class as a whole*." Fed. R. Civ. P. 23(b)(2) (emphasis added).

In *Dukes*, the Court held that:

> [A]t a minimum, claims for individualized relief (like the backpay at issue here) do not satisfy the Rule . . . . Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. ***It does not authorize class certification when each individual class member would be entitled to a different***

> **injunction** or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

*Dukes*, 564 U.S. at 360–61 (emphasis added). The *Dukes* Court noted that "challenges to racial segregation"—something that "was remedied by a single classwide order"— is "what (b)(2) is meant to capture." *Id.* at 361.

Plaintiffs recognize the holding in *Dukes*, but they argue that an injunction would be appropriate if it were tailored to (i) prohibit Defendants from "engaging in further unlawful employment practices"; (ii) "reinstatement of terminated employees"; or (iii) "removal of disparaging discriminatory discipline." (Doc. 52-1 at 19).

The Court cannot grant the first type of injunctive relief because this is a situation "when the relief sought would simply serve as a foundation for a damages award, or when the requested injunctive or declaratory relief merely attempts to reframe a damages claim." *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 530 (6th Cir. 2006); 5 MOORE'S § 23.43(4).[17]

The second and third forms of injunctive relief sought by Plaintiffs involve individualized determinations that would result in a *different injunction* for each

---

[17] The two cases in which the Sixth Circuit has recognized an exception to this rule involved either a contract or an ERISA plan because the relevant document "must mean the same thing regardless of the person to whom it applies." *Clemons v. Norton Healthcare Inc.*, 890 F.3d 254, 279–80 (6th Cir. 2018). That is not the case here and Plaintiffs have not identified a uniform discriminatory practice.

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

44

member who proves that reinstatement or disciplinary exoneration is warranted. This violates Rule 23(b)(2) because "in a Title VII case, whether the discriminatory practice actually was responsible for the individual class member's harm, the applicability of nondiscriminatory reasons for the action, showings of pretext, and any affirmative defense all must be analyzed on an individual basis." *Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 650–51 (6th Cir. 2006) (concluding district court abused its discretion in certifying the class under Rule 23(b)(2) for individual relief); *Dukes*, 564 U.S. at 366–67.

There is not an injunction the Court could issue that would apply to "the class as a whole." Fed. R. Civ. P. 23(b)(2). Therefore, class certification cannot obtain under Rule 23(b)(2).

### b.     Rule 23(b)(3)

Rule 23(b)(3) has two elements: predominance and superiority. *First*, common questions of law or fact must "predominate over any questions affecting only individual members." *Second*, a class action must be "superior to other available methods for fairly and efficiently" resolving the controversy.[18]

---

[18] The rule sets forth a non-exhaustive list of factors as "pertinent" to a 23(b)(3) analysis:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely

### a.      Predominance

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).[19] The predominance element requires that "a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Id.* (citation omitted). Although plaintiffs "need not prove that each element of a claim can be established by classwide proof: 'What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members.'" *Glazer*, 722 F.3d at 858 (citing *Amgen*, 568 U.S. at 469) (emphasis and alteration in original).

The Supreme Court recently explained in detail how courts should evaluate predominance:

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof. The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. When one or more of the central issues in the action

difficulties in managing a class action.

Fed. R. Civ. Pro. 23(b)(3)(A)–(D).

[19] *See also Young*, 693 F.3d at 544 ("While the commonality element of Rule 23(a)(2) requires showing one question of law or fact common to the class, a Rule 23(b)(3) class must show that common questions will *predominate* over individual ones." (emphasis added)).

> are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (alteration, citations, and internal quotation marks omitted).

Here, again, the lion's share of the facts and issues are unique to each class member. And most importantly, Plaintiffs have not—through reliable statistical evidence—shown that they can "produce a common answer to the crucial question *why was I disfavored*." *Dukes*, 564 U.S. at 352. This is unsurprising given that the allegations involve various managers over the years exercising their discretion.

There is nothing about each class member's claim that is susceptible to classwide proof. First, the propriety of each disciplinary action (or work assignment) will need to be assessed, and that holds true even if Plaintiffs had presented probative statistical evidence to initially make out a *prima facie* case of discrimination applicable to every class member. Numerous mini-trials are inevitable. Second, individual trials are unavoidable as to damages because Plaintiffs have no way of proving damages on a classwide basis. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (holding that "class action was improperly certified under Rule 23(b)(3)" because "Questions of individual damage calculations will inevitably overwhelm questions common to the class."). And the Supreme Court has squarely rejected the "novel project" of "Trial by Formula" in calculating damages in employment

discrimination cases. *Dukes*, 564 U.S. at 367. Thus, Plaintiffs have not established the predominance element.

Certifying separate classes as to particular issues would not change the outcome. *See* Fed. R. Civ. P. 23(c)(4). If the Court were to do so, even though "important matters" such as actual injury, causation, or damages will have to be tried separately, *Tyson*, 136 S. Ct. at 1045, the salient point is that Plaintiffs have not even shown that they have the means of proving on a classwide basis that discrimination existed in hundreds (if not thousands) of subjective employment decisions. The only issue in each class member's claim susceptible to classwide proof is the class members' status in a protected class.

Therefore, assuming *arguendo* that there is a tenuous question of fact or law common to the putative class, it does not *predominate* over the swath of issues that will require individualized proof.

### b. Superiority

Rule 23(b)(3)'s superiority requirement aims to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods.*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23 adv. comm. n. to 1966 amend.). In other words, "a class action must be better than, and not merely as good as, other methods of adjudication." 5 MOORE'S § 23.46(1).

To determine whether a class action would be superior, courts are directed to

consider:

> (1) "the difficulties of managing a class action";
>
> (2) "other means of disposing of the suit to determine if a class action is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court"; and
>
> (3) "the value of individual damage awards, as small awards weigh in favor of class suits."

*Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 416 (6th Cir. 2018) (quoting *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 630-31 (6th Cir. 2011)). Weighing these factors here, a class action is not superior to individual actions.

First, "[i]f there are a great number of issues other than damages that must be resolved separately for each class member, or there is a need for a significant number of separate trials, the class action is unmanageable." 5 MOORE'S § 23.46(1); *Pipefitters*, 654 F.3d at 631. Here, the Court will need to make individual determinations as to (1) whether an employment decision (*e.g.*, discipline or work assignment) was tainted with bias; (2) whether that disciplinary measure then result in an actionable adverse employment action; (3) whether the particular supervisor had a legitimate nondiscriminatory reason; and (4) the amount of damages an individual suffered. Thus, there are inherent difficulties in managing this case as a class action.

Second, individual actions would be more efficient and economical. "The less similar the issues, the less value is derived from combining individual claims into a

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

class action." 5 MOORE'S § 23.46(3)(a). The issues here are widely divergent.

Finally, the relatively large amount of damages sought by the individual Plaintiffs suggests that these individuals will not be deterred from bringing separate actions. *See Amchem Prods.*, 521 U.S. at 617. Freeman claims $250,000; Vincent claims $100,000; Lackey claims $200,000; Tall claims $150,000; Gaines claims $75,000; and Purdue claims $75,000. (Doc. 5, ¶¶ 98, 110, 127, 136, 149, 162). Moreover, if Plaintiffs prevail on their § 1981 claims, they will also be entitled to reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b). The same benefit is available to Plaintiffs for their Title VII claims. 42 U.S.C. § 2000e-5(k)). As such, there is an incentive for counsel to represent Plaintiffs, even if it is on an individual basis.

Accordingly, even if all four requirements of Rule 23(a) were satisfied (and they are not), and predominance existed (which it does not), a class action is not a superior method for resolving the claims presented. The Court therefore will not certify this case as a class action.

## II.   Class Notification – Rule 23(e)

Plaintiffs request that if certification is denied, notice be provided to the putative class members that their potential claims are no longer equitably tolled.

Fed. R. Civ. P. 23(e)(1) requires a district court to provide notice to class members in the event of settlement or dismissal. The Sixth Circuit has held that "Rule 23(e) applies in a precertification context where putative class members are likely to be prejudiced" and "may [also] be applied where the district court has already

rejected class certification." *Doe v. Lexington-Fayette Urban Cty. Gov't*, 407 F.3d 755, 761–62 (6th Cir. 2005) (concluding that the district court erred in failing to provide notice to the putative class members), *cert. denied*, 546 U.S. 1094 (2006). There is no absolute rule as to what constitutes prejudice to class members. *Doe*, 407 F.3d at 763. But the amount of publicity is "one factor among others" that a district court should take into account, including the notoriety of the organization involved and the number of potential claimants. *See id.*

Citing to a *brief* two-paragraph article published by a local news channel shortly after this case was filed, Plaintiffs argue there was "significant press" coverage. (Doc. 52-1 at 20 n.18).[20] This lone article is hardly "significant" publicity. But it was published locally where the lawsuit was filed and in proximity to CVG (where potential class members were employed). *Doe*, 407 F.3d at 763 (observing that "once absent class members know of a pending litigation involving their rights, they may act in reliance upon the class action and not file their own individual suits."). This suggests that putative class members knew of the article and will likely be prejudiced if notice is not provided. *Id.* at 762 ("If, upon examination, the district court should find that the putative class members are likely to be prejudiced on account of a . . . dismissal, the district court should provide Rule 23(e) notice.").

---

[20] *Current, former Delta employees file class action complaint against airline*, WLWT5 (Sept. 8, 2015, 11:00 AM), https://www.wlwt.com/article/current-former-delta-employees-file-class-action-complaint-against-airline/3557712.

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.

Accordingly, the Court finds that notice should be provided to the putative class members in this matter.

## III. CONCLUSION

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 564 U.S. at 348 (citation omitted). That class certification is inappropriate in this case does not vitiate the individual claims of the class representatives. They may choose to proceed on their claims. But a class action is not the appropriate vehicle because there is *nothing* central to Plaintiffs' claims that is capable of being resolved on a classwide basis.

## IV. ORDER

Consistent with the accompanying Memorandum Opinion, it is hereby **ORDERED** that:

(1) Plaintiffs' motion to certify the case as a class action (Doc. 52), is **DENIED.**

(2) The parties shall confer and submit a proposed notice to putative class members, specifying its means of publication or distribution, within **ten (10) days** of entry of this Opinion and Order.

This 14th day of June 2019.



Signed By:

*William O. Bertelsman* WOB

**United States District Judge**

*Brandon Freeman* et al. *v. Delta Airlines, Inc.* et al.