IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON


CIVIL ACTION No. 2:15-CV-160 (WOB-CJS)

BRANDON FREEMAN, ET AL.                                    PLAINTIFFS


VS.                        MEMORANDUM OPINION AND ORDER


DELTA AIRLINES, INC., ET AL.                               DEFENDANTS


This is an employment discrimination action brought under 42 U.S.C. § 1981, Title VII, 42 U.S.C. § 2000e *et seq.*, and KRS § 344.010 *et seq.* by six African-American individuals who all were (or are) employees of Delta Airlines at the Cincinnati/Northern Kentucky International Airport.

These cases are now before the Court on various motions for summary judgment. (Docs. 108-118). The Court has reviewed these motions and concludes that oral argument is unnecessary.

As explained below, while this case was initially filed as a class action, the Court found that class certification was inappropriate. (Doc. 93). Consequently, each plaintiff bears the burden of opposing defendants' motions for summary judgment with evidence pertinent to their own claims.

Because most facts relating to each plaintiff's claims are unique to them, the Court will issue a separate opinion for each plaintiff. However, for efficiency purposes, this initial opinion will set forth the facts that are common to all plaintiffs, as well as the law that governs their causes of action. The opinion will then address the claims of the first listed plaintiff, Brandon Freeman; subsequent opinions will address the claims of the

remaining plaintiffs: Freddie Vincent, Anika Nicole Lackey, Aminata Tall, Kenny Gaines, and David Perdue.

***Factual and Procedural Background***

**A. Department 120 Structure**

Plaintiffs were/are employed by Delta as "Ready-Reserve" employees at the Cincinnati/Northern Kentucky International Airport ("CVG"). Ready-Reserve employees are part-time employees of Delta's Department 120, which includes baggage handlers, ground service equipment maintenance workers, and ramp employees. (Doc. 60 at 2; Doc. 63, Perdue Dep., Doc. 63, 49). They primarily assist during peak flight times. (Jones Dep., Doc. 73, 63–64; Freeman Dep., Doc. 69, 92; Martinez Dep., Doc. 73, 54).

Ready-Reserve employees are limited to working between 600 and 1400 hours per year. They do not receive regular benefits from Delta, but they do receive employee flight privileges. Specifically, these employees receive unlimited passes for themselves, which allow them to travel for free on Delta flights when space allows; unlimited companion passes; and eight round-trip buddy passes per year.[1] (Kuhn Dep., Doc. 121, 62-63; Seppings Dep., Doc. 105, 17). These flight privileges are the primary attraction of the Ready-Reserve position. (Freeman Dep. 59-60; Race Depo., Doc. 76, 34-35). Many Ready-Reserve employees thus work at Delta as a second job and are employed full time elsewhere.

However, there are restrictions on the use of this "nonrevenue" travel by Delta employees. As pertinent here, Delta's policies state that nonrevenue travel privileges "may not be used as a means to transport checked items on board an aircraft for which the pass

---

[1] Employees can give their buddy passes to anyone, but companion passes are issued only to domestic partners. (Jones Dep. 203).

rider has no intent to travel." (Doc. 102 at 29). *See also id.* at 35 (stating as a restriction: "Using Delta pass travel privileges to transport checked items on board an aircraft for which the pass rider has no intent to travel (in other words, you're not allowed to check a bag if you're not planning to fly.)". This policy states that its violation may result in disciplinary action, up to and including termination.

Ready-Reserve employees receive a pay increase after six months of employment; thereafter, they would receive raises only if there was a company-wide pay increase. (Jones Dep. 182-83; Jessup Dep., Doc. 103, 33).

A Department Manager oversees Department 120; at relevant times, defendant Chuck Jones was the Department Manager at CVG. Reporting to Jones were Performance Leaders ("PLs"), who directly supervise employees. Defendants Unkraut, Howe, Gosney, and Davis were Performance Leaders. Defendant Greg Kuhn was the Regional Corporate Security Manager covering CVG. (Kuhn Dep. 12).

Assignments for Ready-Reserve employees were made through an automated system called the Realtime Staffing Manager, or RTSM. (Jones Dep. 79-80). This system would automatically assign employees to cover the flights scheduled on a given day, matching flight data with employees' shifts and positions. (Jones Dep. 79-82, 267-69, 276-77; Martinez Dep. 47). Then, any changes that became necessary due to personnel needs would be made manually by an employee overseeing the system. (*Id.*).

## B.     Plaintiff Brandon Freeman

Brandon Freeman was hired by Delta in April 2010, after his previous employer, Comair, went out of business. (Freeman Dep. 44, 56-57). Delta was Freeman's second job; he was also employed full time as a firefighter for the Cincinnati Fire Department. (Freeman Dep. 31, 60).

In November 2010, Freeman received a warning letter for attendance and reliability issues. (Doc. 69-1 at 12). In April 2011, he was given a probationary letter for more attendance problems, as well as for engaging in a verbal disagreement with a co-worker. (Doc. 69-1 at 16; Freeman Dep. 166). The probation was for six months, during which time Freeman was ineligible for salary increases, could not bid on other positions, and was required to provide a doctor's certificate for absences due to illness.[2] (*Id.*). Freeman was removed from probation in October 2011. (Doc. 69-1 at 17).

In June 2013, Freeman filed for Chapter 13 bankruptcy. (Freeman Dep. 26). The bankruptcy remained open until May 29, 2019. Freeman never listed his claim against Delta in his bankruptcy estate or disclosed its existence during the time his bankruptcy was pending.

### 1. Allegations Involving Michelle Race

In 2011, Freeman began a relationship with another Ready-Reserve employee, Michelle Race, who is Caucasian. (Race Depo. at 305). The relationship was "on again, off again." (Freeman Dep. 13). No one at Delta ever said anything disapproving of the relationship to Freeman, but Race told him that the managers who were "good old boys" did not approve of it. (Freeman Dep. 118).

On September 1, 2013, an anonymous email was sent to defendant Chuck Jones from the email address readyreserve@yahoo.com. (Doc. 73-1 at 94-95). The email stated it was from "a group of us ready reserves," and it complained first about two Ready-Reserve employees who were Cincinnati firemen—Freeman and Jeff Love— who were allowed to be late to their shifts, whereas other employees were not. Next, the email

---

[2] This probation policy was eliminated effective March 1, 2012. (Jones Dep. 178).

stated:

> And the biggest rule breaker is Brandon Freeman who never gets wrote up. While his girlfriend Machelle (*sic*) Race was in the hospital [h]e signed up on the swap board a bunch of shift trades so he wouldn't have to work and never got in trouble, we have all heard him yelling and cussing and hitting his girlfriend and never getting in trouble cause she is so afraid of him, last year he got mad at her and stole her buddy passes and sold them and he didn't get in any trouble . . . [H]e makes his girlfriend work all his shifts all the time because nobody else will trade with him because we all know he is a awful person, and he don't pay shifts back, he makes his girlfriend pay back all his trades and she does because if not, he will beat her. He has had a lot of no call no shows and never got in trouble. On the last bid he wanted the shift Machelle (*sic*) had bid on but she wanted to keep it, so he harassed her and bullied her until she gave him her bid line . . .

(*Id.*). Jones forwarded this email to defendant Gregory Kuhn, who began an investigation. (*Id.*; Kuhn Dep. 36).

Kuhn was also contacted by another Ready-Reserve employee, plaintiff Nicole Lackey, who was a friend of Race. (Kuhn Dep. 37). Lackey telephoned Kuhn and told him about Freeman's treatment of Race, and Kuhn asked her to provide a written statement. In a letter dated September 30, 2013, Lackey described "disturbing behavior" by Freeman towards Race, including: bullying; taking her buddy passes and selling them; directing other employees to harass Race; trying to hit Race with his car in the employee parking lot; forcing Race to work his shifts; and stealing her password to make shift swaps while she was in the hospital.(Doc. 74-1 at 13-15). Lackey stated that she had encouraged Race to tell management about Freeman but that Race was scared.[3]

Kuhn and Jones interviewed both Freeman and Race. (Doc. 69-1 at 19-21). Freeman denied all the allegations concerning mistreatment of Race. (Doc. 69-1 at 18-21).

---

[3] Lackey would later testify that this statement was both false and coerced. (Lackey Dep., Doc. 74, 203-217).

Kuhn's notes of their interview with Race reflect that Race told Jones and Kuhn that "I do whatever Brandon wants me to do so I don't make him angry." (*Id.*). Kuhn's notes state it was evident that Race was afraid of Freeman. (*Id.* at 21; Jones Dep. 233).

Race testified in her deposition that Kuhn asked her if she was in a relationship with Freeman and whether it was sexual, and Race told him yes. (Race Dep. at 50-51). Kuhn also asked her how her family felt about her dating a black man, and Race told him that her family liked Freeman. Race testified that she told them that Freeman had not threatened her, that she was not afraid of him, and that he did not bully her. (Race Depo. 50-51, 78).

Race was asked to provide a written statement, but she did not do so after sitting for several hours in Jones' office. (Jones Dep. 236-37). However, she later provided a written statement confirming that the allegations regarding Freeman's mistreatment of her were true. (Doc. 76-1).[4] The statement confirmed that Freeman harassed her into switching job bids and giving him her buddy passes; he stole her buddy passes; he logged into the MPS using her name and entering days off; and he had his friends harass her. (Doc. 76-1 at 9). Race also stated that she never made a formal complaint because "I always am afraid of what Brandon would do if I tell on him [because he] is a very mean person with a terrible temper and I am extremely scared of him." (*Id.*).

Freeman was then suspended pending the outcome of the investigation.

On October 6 and 9, 2013, however, Race emailed Paul Baird, who was Jones' supervisor, and asked him to "help [Freeman] keep his job at Delta." (Doc. 69-1 at 30-31). Race completely recanted her statements about Freeman mistreating her, including her

---

[4] Race would later testify that she was coerced into writing this statement. (Race Dep., Doc. 76,91-94).

confirmation of the statements in Lackey's letter. (*Id.*).

On October 7, 2013, Freeman emailed a Delta Senior Vice President about the investigation, stating that it "has a deep undertone of Racism." (Doc. 69-1 at 32). A field equal employment official responded by email to Freeman on October 10, 2013, stating that they had looked into his concerns, did not find them to be substantiated, and that the investigation was closed. (Doc. 69-1 at 33).

Given Race's recantation, Delta ended its investigation, and Freeman was returned to work on October 16, 2013. (Freeman Dep. 203-04; Doc. 69-1 at 14; Jones Dep. 60-61).[5]

### 2. Freeman's Termination

On April 23, 2014, Freeman checked a bag on a flight to Atlanta for a female friend who was a Delta flight attendant, Debbie Coffman.[6] (Freeman Dep. 125). Freeman testified that his plan was to fly to Atlanta, have dinner with Coffman, and fly home. (*Id.* at 129-32). However, because Freeman was scheduled to work that afternoon, he asked co-worker Freddie Vincent to work his shift, and Vincent agreed. (*Id.*).

Freeman made the reservation for himself at 3:00 p.m., and he checked himself and the bag onto the Atlanta flight at 4:30 p.m. (Freeman Dep. 132; Doc. 69-1 at 7).

Freeman testified that Vincent called him thereafter and told him he could not cover Freeman's shift, so Freeman did not board the plane and instead continued to work. (Freeman Dep. 132-33).

Shortly thereafter, Freeman was late to meet a flight he was scheduled to cover as a baggage driver. Supervisor Matt Heringer found Freeman and asked why he missed his

---

[5] Michelle Race filed a separate lawsuit on June 6, 2018, (Cov. Civ. Case No. 18-94), although she had been deposed as a witness in this case in 2016.

[6] Coffman is sometimes referred to in the record as Deborah Hiserote, her last name after marrying. This opinion will refer to her as Debbie Coffman.

assignment. (Heringer Dep.16-25; Freeman Dep. 137-138; Doc. 69-1 at 15). Freeman told Heringer that he was having stomach issues and had been in the bathroom. Freeman did not tell Heringer about his having been booked to travel on the Atlanta flight. (*Id*.).

Subsequently, defendant Unkraut was alerted by another employee that there was a bag checked on the Atlanta flight in Freeman's name, although Freeman was then working. (Unkraut Dep. 65-66; Martinez Dep. 109-11). Unkraut found Freeman and, along with supervisor Leslie Martinez, talked to him about what had happened.

In his deposition, Freeman testified that Unkraut asked him why he checked the bag but did not fly. (Freeman Dep. 138). Freeman testified he could not recall what explanation he gave. (Freeman Dep. 138-39). Martinez testified that she asked Freeman what happened, and "he said that he checked a bag for a friend that was going to pick up the bag in Atlanta." (Martinez Dep. 113). Martinez asked Freeman if he intended to fly, and "he said, "No. I'm just sending the bag to her, and she's going to pick it up." (*Id*.).[7] Martinez also testified that Freeman did not mention anything about Freddie Vincent covering his shift. (Martinez Dep. 144-45). Freeman confirmed this in his deposition. (Freeman Dep. 146-47).[8]

Unkraut asked Freeman to write a statement about what occurred, and Freeman wrote:

> On the above listed date at approximately 1630 hours I checked in for a flight to Atlanta and checked a bag. I made the reservation at approximately 1500 hours. I was sending a bag two days before I was scheduled to go visit a friend who needed some of their personal items sooner. I was also experiencing stomach problems, and was in the bathroom in T-Drive when my flight came into B-10. I was

---

[7] Martinez later prepared a written statement reflecting the conversation with Freeman. (Doc. 75-1 at 113).

[8] Freeman testified that he did not mention his arrangement with Vincent to Martinez, Unkraut or Heringer because Unkraut had asked him if he was sending drugs in the bag he checked, and Freeman was "so pissed" that he just wanted to "get out of there." (Freeman Dep. 140-41, 147-48).

> subsequently late to my gate to pick up my bags. I did not pack the
> bag, and Debbie Coffman is picking up her bag.

(Doc. 69-1 at 7). Freeman testified in his deposition that everything in this statement is

true. (Freeman Dep. 142).[9] Martinez and Heringer communicated the situation to Jones

before the shift ended. (Martinez Dep. 119-20).

On May 5, 2014, Freeman was suspended. (Freeman Dep. 144-48; Doc. 69-1 at 9).

Based upon information from Unkraut and Martinez's conversation with Freeman, Jones

recommended to the Field Director that Freeman's employment be terminated. (Doc. 105

at 62). Human Resources in Atlanta further reviewed the matter and also recommended

termination. (Doc. 105 at 61; Jessup Dep. 97-98).[10]

Specifically, HR Program Director Barbara Shaw testified that she received a file

with the termination recommendations and written statements, including Freeman's, and

concluded that termination was appropriate because Freeman had violated the policy

against sending bags without the intent to travel. (Shaw Dep. 119-36). That

recommendation was approved by Delta's Director of Human Resources on May 9, 2014.

(Doc. 105 at 61; Jessup Dep. 108-09).

By letter dated June 16, 2014, Freeman filed an appeal to the Human Resources

Department in Atlanta. (Doc. 69-1 at 8-9).[11] In this letter, Freeman complained about

---

[9] Later in the deposition, however, after a break in the afternoon, Freeman testified that there was a mistake in his written statement in that where he wrote that he was sending the bag "two days" before he was scheduled to travel, he actually meant "two hours." (Freeman Dep. 221). It is undisputed, however, that Freeman never told Delta about this mistake prior to his termination.

[10] At some point in this process, Delta security asked Coffman to confirm that the bag was hers and to write a statement about the circumstances. (Hiserote Dep. 31-32). Coffman wrote a statement saying that Freeman had planned to fly to Atlanta to bring her the bag, have dinner, and then return to CVG. (Doc. 102 at 27).

[11] This appeal letter does not reference the "days/hours" discrepancy that Freeman testified to in his deposition, nor does it mention his allegation that Unkraut asked him if he was shipping drugs in the bag. Freeman's EEOC charge filed in July 2014 also does not mention these two issues. (Doc. 69-1 at 39-41).

racism in Delta's underwing operations at CVG, and he stated that he believed he was fired because of his race. (*Id.*). He also related that he had asked Vincent to cover his shift on April 23 and that Vincent had backed out.

Freeman's appeal was reviewed by Human Resources officials in Atlanta who were not involved in the original termination decision. (Jessup Dep. 114).

By letter dated December 10, 2014, Delta's Director of Equal Opportunity and Compliance, Melissa Seppings, informed Freeman that an investigation had been conducted into all the issues he raised. (Doc. 69-1 at 10-11). Seppings detailed the investigation and stated that Freeman's accusation of racism in the discipline of Ready-Reserve employees at CVG and of racism in his termination were not substantiated. Seppings explained that his appeal was thus denied.

### 3. Allegations Regarding Racial Harassment

When asked in his deposition if any Delta manager directed any racially derogatory term at him, Freeman testified that defendant Howe called him "Slick." (Freeman Dep. 104-05). Freeman told Howe that he did not like being called by that name. (*Id.*). He also testified that the use of nicknames was common in Department 120. (Freeman Dep. 109). Freeman never heard any other manager or supervisor use any racially derogatory term. (Freeman Dep. 107).

Freeman testified that defendant Gosney was often moody and once slammed a door in Freeman's face while he was talking to another employee in his office. (Freeman Dep. 111-13).

Freeman did not have any problems with defendant Davis, but he testified that defendant Unkraut was condescending and never seemed to want to help. (Freeman Dep. 116). Freeman did not observe Unkraut treat any other African-American employee that

way. (*Id.* 118-19).

Freeman testified that his co-worker, plaintiff Nicole Lackey, once became upset over a sign that someone put up that said "Free Dave." (Freeman Dep. 120-21). This apparently referred to another black Ready-Reserve employee, plaintiff David Perdue, who was escorted out of work one day because his security badge had expired. (Perdue Dep. 63-64). Later, an unidentified employee put up a hand-drawn sign of a person in jail that said "Free Dave." Lackey was offended by the sign and asked Freeman to remove it. Freeman could not recall at his deposition what the sign depicted, but that it was "something racially" because Lackey was offended. (Freeman Dep. 120). Freeman never saw any tattoos on co-workers that concerned him, nor did he hear any co-workers express such concerns. (Freeman Dep. 124).

### C.    EEOC Charges and Internal Investigation

Plaintiffs all filed EEOC charges in July 2014. This caused Delta to initiate an investigation into the allegations of racial discrimination at CVG. Human Resources officials from Atlanta visited CVG and interviewed plaintiffs, managers, and reviewed documentation relating to discipline and work assignments. (Guerrant Dep. 53-60; Shaw Dep. 47-50). Delta did not find the allegations of differential treatment based on race to be substantiated. (Guerrant Dep. 66, 73-75).

### D.    This Litigation

After receiving right-to-sue letters from the EEOC in June 2015, plaintiffs filed this case as a proposed class action on September 3, 2015. (Doc. 1). They filed an Amended Complaint on September 10, 2015. (Doc. 5).

Plaintiffs allege the following claims:

**Count I:**          Hostile work environment/racial harassment (Title VII; sec. 1981,

|  | KRS 344, against Delta) |
|---|---|
| **Count II:** | Race discrimination (disparate treatment and impact against Delta)[12] |
| **Count III:** | Retaliation (federal law as to Delta; state law as to individual defendants) |
| **Count IV:** | Race discrimination (sec. 1981 – all defendants) |

(Doc. 5). Plaintiffs allege generally that Delta discriminated against them on the basis of race in discipline and work assignments.

The parties spent over a year conducting discovery on class certification issues. Following briefing and oral argument, the Court issued an opinion on June 14, 2019, denying class certification. (Doc. 93). Notice of that denial was then sent to class members, and the parties then requested a lengthy summary judgment briefing schedule. (Doc. 100).

All motions for summary judgment are now ripe for resolution.

## *Analysis*

**A. General Legal Standards**

### 1. Hostile Environment/Racial Harassment

A hostile work environment claim requires proof that (1) plaintiff belongs to a protected class; (2) that she was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action. *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (citation

---

[12] Plaintiffs appear to have abandoned any disparate impact claims. They do not mention them in their memoranda in opposition, and their arguments invoke only disparate treatment analyses.

omitted).[13]

Only harassment *based on the plaintiff's race* satisfies the third element of this test. *Williams v. CSX Trans. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms, or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace. *Id.*

At the summary judgment stage, the Court looks "at the totality of the alleged race-based harassment to determine whether it was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Phillips*, 854 F.3d at 327. That is, the Court examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

"[O]ccasional offensive utterances do not rise to the level required to create a hostile work environment because to hold otherwise would risk changing Title VII into a code of workplace civility." *Id.* (citation and internal quotations omitted). Moreover, comments by co-workers rather than supervisors, and comments not directed at the plaintiff, are considered less severe. *Watkins v. Wilkie*, 815 F. App'x 1003, 1004 (6th Cir. 2020).

The Sixth Circuit has thus noted that a plaintiff alleging an actionable hostile work environment faces a "relatively high bar". *Phillips*, 854 F.3d at 328. *See also Stewart v. Esper*, 815 F. App'x 8, 21 (6th Cir. 2020) (noting that "the severe and pervasive

---

[13] The elements of this claim are the same under Title VII, Section 1981, and KRS 344. *See Williams v. CSX Trans. Co., Inc.*, 643 F.3d 502, 511 n.4 (6th Cir. 2011); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000) (citation omitted).

requirement is a high bar") (citation omitted).

### 1. **Race Discrimination**

To establish a prima facie case of race discrimination, a plaintiff must show that: (1) he is a member of a protected class, (2) he was qualified for the job and performed it satisfactorily, (3) despite his qualifications and performance, he suffered an adverse employment action, and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated person outside the protected class. *Wingo v. Michigan Bell Tel. Co.*, 815 F. App'x 43, 45 (6th Cir. 2020) (citation omitted).

For purposes of the prima facie case, "adverse employment actions are typically marked by a 'significant change in employment status,' including 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *O'Donnell v. Univ. Hosp. Cleveland Med. Ctr.*, 833 F. App'x 605, 620 (6th Cir. 2020) (citation omitted). A "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not enough to constitute an adverse action. *Id. See, e.g., Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 449-50 (6th Cir. 2004) (holding that alleged scheduling that resulted in plaintiff receiving more difficult workloads, and the employer's failure to train plaintiff on rural delivery routes, were not cognizable "adverse actions" for purposes of a disparate treatment claim).

If plaintiff establishes a prima facie case of discrimination, the defendant then must proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 449. If defendant does so, plaintiff must produce evidence from which a reasonable factfinder could conclude that defendant's reason was a pretext for unlawful discrimination. *Id.*

Plaintiff may show pretext by demonstrating that the employer's reason (1) had no basis in fact, (2) was not the actual reason, or (3) was insufficient to explain the defendant's action. *Id.* In addition, plaintiff "must show by a preponderance of the evidence that the true motivation for the adverse employment action included intentional discrimination." *Id.*

The "pattern-or-practice" method of proving discrimination, "in which the plaintiff shows that the company had a policy of discriminating against a protected class," is generally limited to class actions or suits by the government. *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004). Such a theory is "inappropriate as a vehicle for proving discrimination in an individual case," although such evidence may be relevant to proving "an otherwise-viable claim for disparate treatment" under the burden-shifting framework." *Id.*

In lieu of the burden-shifting framework, a plaintiff may proceed under a "mixed motive" analysis, which requires that plaintiff show, either by direct or circumstantial evidence, that race was "a motivating factor" in the adverse employment action. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 (6th Cir. 2006). The "ultimate question at summary judgment on a mixed-motive case is whether the plaintiff has presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that [a protected characteristic] was *a motivating factor* in [the defendant's adverse employment action against the plaintiff]." *Id.* (internal quotations and citation omitted).

### 3. Retaliation

To establish a prima facie claim of retaliation, a plaintiff must show: (1) that he engaged in a protected activity; (2) his exercise of such protected activity was known to the defendants, (3) defendants thereafter took an action that was materially adverse to

him, and (4) a causal connection existed between the protected activity and the materially adverse action. *Wingo*, 815 F. App'x at 46.

If the plaintiff establishes a prima facie case, defendant must offer a legitimate, nonretaliatory reason for its action. *Id.* If it does so, the burden shifts back to the plaintiff to show that the proffered reason was not the true reason for the employment decision but rather was a pretext for retaliation. *Id.*

Proving causation requires the plaintiff to demonstrate that the adverse action would not have occurred but for the protected activity. *Id.* Temporal proximity alone "is generally not enough to establish the prima facie element of causation." *Id.* "This is especially so when an intervening act disrupts the purported causal chain between a protected act and an adverse employment action." *Id.* at 47.

## B. <u>Brandon Freeman's Claims</u>[14]

### 1. <u>Judicial Estoppel</u>

"The doctrine of judicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 476 (6th Cir. 2010) (citation omitted). The doctrine is "utilized in order to preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Id.* (internal quotations and citations omitted).

The Sixth Circuit has "explicitly held that judicial estoppel may bar employment-related claims where the plaintiff has failed to disclose as an asset in a bankruptcy proceeding . . . the existence of such a claim." *Newman v. Univ. of Dayton*, 751 F. App'x

---

[14] The individual defendants join in Delta's motion for summary judgment. (Docs. 108, 116).

809, 814 (6th Cir. 2018).

In *White*, the Sixth Circuit outlined the factors relevant to this analysis:

> In short, to support a finding of judicial estoppel, we must find that: (1) White assumed a position that was contrary to the one that she asserted under oath in the bankruptcy proceedings; (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) White's omission did not result from mistake or inadvertence. In determining whether White's conduct resulted from mistake or inadvertence, this court considers whether: (1) she lacked knowledge of the factual basis of the undisclosed claims; (2) she had a motive for concealment; and (3) the evidence indicates an absence of bad faith. In determining whether there was an absence of bad faith, we will look, in particular, at White's "attempts" to advise the bankruptcy court of her omitted claims.

*White*, 617 F.3d at 478.

The *White* court held that the plaintiff's sexual harassment claims were barred by judicial estoppel because she failed to list them in her bankruptcy, and she only attempted to correct those filings after defendant filed a motion to dismiss her claims. *Id.* at 481 ("We will not consider favorably the fact that White updated her initial filings after the motion to dismiss was filed. To do so would encourage gamesmanship, since White only fixed her filings after the opposing party pointed out that those filings were inaccurate.").

Importantly, the debtor's duty to disclose any potential claims in his schedule of assets and liabilities is "ongoing, meaning a debtor has an express, affirmative duty to disclose all assets, **including contingent and unliquidated claims that arise at any time during the bankruptcy proceeding**." *Davis v. Fiat Chrysler Auto. U.S., LLC*, 747 F. App'x 309, 314 (6th Cir. 2018) (internal quotations and citations omitted) (emphasis added).

In *Davis*, the Sixth Circuit held that plaintiff's claim for a racially hostile work environment was barred because, although she filed for bankruptcy seven years before

she filed her employment lawsuit, she had sufficient information to know about her cause of action *before her bankruptcy was discharged*, and she failed to disclose it. *Id.* at 314-15.

Likewise, in *Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 315-16 (6th Cir. 2013), the Sixth Circuit affirmed the dismissal of plaintiff's employment claim because, although she was terminated during the repayment period of her bankruptcy plan, she failed to amend her schedules to reflect the potential suit before the bankruptcy closed. The Court noted that applying "judicial estoppel under these circumstances recognizes the importance of the bankruptcy debtor's affirmative and ongoing duty to disclose assets, including unliquidated litigation interests." *Id.* at 314.

Under this authority, it is clear that Freeman's claims are barred by judicial estoppel.

Freeman filed for Chapter 13 bankruptcy on June 6, 2013, while employed by Delta. (Doc. 112-1 at 7). He was represented by counsel. His Chapter 13 Plan was confirmed on November 22, 2013, and it called for Freeman to make monthly payments to the Trustee for approximately five years. (*Id.* at 11, 80-92).

Paragraph 16 of the Plan states:

> **Debtor shall keep the Trustee informed as to** any change in status of any claims for personal injury, workers compensation, social security **or any other claim to which Debtor may be entitled.** Before the claim can be settled and distributed, Debtor must comply with all requirements for filing applications and motion for settlement with the Court as required by the Bankruptcy Code and Local Bankruptcy Rules. **These funds shall be treated as additional Plan payments or as the Court so otherwise orders.** Debtor's case will not be complete until the claim has been settled and shall remain open for administration purposes until the claims have been paid into the Plan or the Court orders otherwise.

(Doc. 112-1 at 87) (emphasis added).

Approximately eight months after this Plan was approved, Freeman filed a charge with the EEOC alleging racial discrimination. (Doc. 69-1 at 39-41). A year later, this lawsuit was filed. At that time, Freeman's bankruptcy case was still proceeding; it was not closed until May 29, 2019, nearly four years after this lawsuit was filed.

At no time during the above period did Freeman disclose his claims against Delta to the bankruptcy court. Instead, it was not until **January 10, 2020**—after Freeman's bankruptcy was closed and after defendants filed their motion for summary judgment in this matter—that Freeman moved to reopen his bankruptcy case to disclose his claims. (Doc. 128-3 at 11-13).

Thus, every factor discussed above weighs in favor of applying judicial estoppel.

Freeman makes several arguments opposing the bar of judicial estoppel.[15] He first argues that estoppel is unwarranted because he disclosed his *income* from his employment at Delta in his bankruptcy schedule. This is irrelevant. The relevant question instead is whether the debtor disclosed all potential, unliquidated claims that he now wishes to assert, which are assets in their own right.

Freeman's other arguments are ones routinely rejected by the Sixth Circuit. First, he argues that he did not have knowledge of his claim when he first filed for bankruptcy. This ignores the fact that the duty of disclosure is an ongoing one, and Freeman does not dispute that his claim arose, and this case was filed, while his bankruptcy was pending. *See, e.g., Kimberlin*, 520 F. App'x at 314.

Freeman next argues that he relied on his counsel, who has filed a declaration effectively claiming to have been unaware of the law discussed above.

---

[15] Freeman first argues that defendants did not assert the defense of estoppel in their answers. This is not true. (Doc. 9 at 27; Doc. 13 at 17; Doc. 7 at 19).

The Sixth Circuit, however, has repeatedly rejected such "advice of counsel" arguments because parties are bound by the actions of their attorneys, and because debtors sign their bankruptcy petitions under penalty of perjury and are responsible for updating their filings as their assets change. *See Newman*, 751 F. App'x at 815; *White*, 617 F.3d at 483-84; *Lewis*, 141 F. App'x at 427.[16]

Finally, Freeman argues that he did eventually amend his Plan schedules to disclose his claims against Delta. As noted, however, the Sixth Circuit does not consider favorably such a belated disclosure, particularly where disclosure occurs only after the failure to disclose has been raised as a defense in the current proceeding. *White*, 617 F.3d at 481. *See also Hayden v. GR Spring & Stamping, Inc.*, Civil No. 5:13-cv-120-JMH, 2013 WL 2382831, at *4 (E.D. Ky. May 30, 2013) ("In the case, there is no question that Williams made absolutely no effort, successful or otherwise, to amend her bankruptcy schedules until May 16, 2013, six days after Defendant filed its motion to dismiss her as a party. . . Unfortunately, under Sixth Circuit precedent, this effort is too little, too late.").

Therefore, Freeman's claims are barred in their entirety by judicial estoppel.

Although the Court finds this conclusion dispositive, it will address the merits of Freeman's claims for thoroughness and possible appellate review.

---

[16] Counsel's declaration states: "I did look at [Freeman's] bankruptcy filings in early 2016, and found nothing in those filings that would have suggested any need to update schedules." (Doc. 128-3 at 2). This averment is troubling given that, as noted above, Freeman's Plan on its face stated that Freeman had an ongoing duty to disclose any new claims that arose during the Plan's implementation. (Doc. 112-1 at 87).

**2.    Race Discrimination**

**a.    2010 and 2011 Warning and Probationary Letter**

As previously noted, Freeman asserts his race discrimination claim under Title VII, 42 U.S.C. § 1981, and the KCRA.

Under Title VII, a plaintiff must file an EEOC charge within 300 days of the discrete employment action they challenge. *Watson v. Ohio Dep't of Rehab. & Corr.*, 690 F. App'x 885, 889 (6th Cir. 2017). Actions for which no timely EEOC charge were filed are unexhausted and thus cannot constitute an "adverse action" for a Title VII claim. *Id.*; *Johnson v. United Parcel Serv.*, 117 F. App'x 444, 450 (6th Cir. 2004).

In turn, a four-year statute of limitations applies to claims brought under § 1981, *Jones v. R.R. Donnelley $ Sons Co.*, 541 U.S. 369, 382-84 (2004), and a five-year statute of limitations applies to KCRA claims. *Flynn v. Intelligrated Serv., LLC*, Civil No. 3:20-cv-00019-GFVT, 2021 WL 899082, at *2 (E.D. Ky. Mar. 8, 2021) (citation omitted).

Because the disciplinary letters that Freeman received in November 2010 and April 2011 fall outside the limitations periods for Title VII and § 1981, they are cognizable only under the KCRA.

Defendants argue that these warning letters do not constitute "adverse employment actions" for purposes of the prima facie case of a race discrimination claim.

Freeman addresses this argument in a conclusory fashion. (Doc. 128 at 28-29). He does not explain how these two write-ups "significantly" changed his employment status, as required by Sixth Circuit law. He asserts that they affected his eligibility for raises and promotions, but the record contains no evidence that he was denied either because of this discipline.

He also asserts that these write-ups "were considered in the later suspension," but

that statement finds no support in the record. Instead, Freeman's suspension in 2013 was unrelated to attendance or tardiness; rather, it was triggered by allegations that he was mistreating Race.

In short, these two minor disciplinary write-ups cannot serve as "adverse employment actions" for a prima facie case of discrimination.[17]

### b.    Work Assignments

Freeman next argues that "assigning racial minorities less favorable job assignments constitutes an adverse action." (Doc. 128 at 24).

Freeman testified that he thought the African-American Ready-Reserve employees got the "crappier," more labor-intensive assignments, such as late-night assignments, setting up gates, and collecting tubs. (Freeman Dep. 236-37). However, Freeman conceded that white employees were also given these allegedly harder assignments. (Freeman Dep. 311).

As noted above, "adverse employment actions are typically marked by a 'significant change in employment status,' including 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *O'Donnell v. Univ. Hosp. Cleveland Med. Ctr.*, 833 F. App'x 605, 621 (6th Cir. 2020) (citation omitted).

The Sixth Circuit and courts within it have held that allegedly unfavorable or more difficult assignments, unaccompanied by a change in pay or hours worked, generally do

---

[17] Freeman also references expert reports proffered in relation to the allegedly discriminatory discipline within Department 120. These reports were originally offered in support of class certification. *See* Doc. 52-1. Moreover, plaintiffs' expert witness stated the data she was provided "are insufficient to perform analyses that fully address the issue of differential discipline." (Doc. 52-12 at 5). She nonetheless went on to recite the number of employees, African American and non-African American, who received corrective action notices in 2013 and 2014. *Id.* at 9. But this sheds no light on whether any particular disciplinary write-up constitutes an "adverse employment action" or whether it was the product of intentional discrimination.

not rise to the level of an "adverse employment action" for purposes of a disparate treatment claim. *See O'Donnell v. Univ. Hosp. Cleveland Med. Ctr.*, 833 F. App'x 605, 619-20 (6th Cir. 2020) (plaintiff's allegation that she received more difficult tasks with less time for preparation did not establish adverse employment action); *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 449-50 (6th Cir. 2004) (plaintiff's allegation that defendant discriminated on the basis of race in scheduling and delivery routes, causing him to have more difficult workloads, did not establish adverse employment action); *Lagunovich v. Findlay City Sch. Sys.*, 181 F. Supp.2d 753, (N.D. Ohio 2001) ("Larger work assignments do not constitute a materially adverse employment action" under Sixth Circuit law). *See also Pierri v. Medline Ind., Inc.*, 970 F.3d 803, 808 (7th Cir. 2020) (change in plaintiff's work assignments was not adverse action, where "he remained in the same job position, in the same department, and at the same desk").

Here, it is undisputed that there was no difference in Ready-Reserve employees' pay based on job assignments, which changed from day to day. (Race Depo. at 73). Freeman does not allege that he was asked to perform any tasks that fell outside the Ready-Reserve job duties, or that any assignments caused a material change in his employment status.

Freeman relies on *Spees v. James Marine, Inc.*, 617 F.3d 380 (6th Cir. 2010), but that case is distinguishable. The Court there held that plaintiff's transfer from day shift to night shift (which was particularly onerous because she was a single mother), in a different department with less challenging duties, was effectively a demotion and thus constituted an adverse action. *Id.* at 391-92. No such facts are present here.

Moreover, while Freeman argues that his perception that certain tasks were considered "crappier" controls, this is incorrect. "Whether something constitutes an

adverse employment action is viewed objectively, and the question is whether the employment action was 'objectively intolerable to a reasonable person.'" *Stewart v. Esper*, 815 F. App'x 8, 17 (6th Cir. 2020) (citation omitted).

Finally, Delta correctly notes that whether any particular assignment was considered harder or less desirable was subjective, as plaintiffs and other witnesses testified that Ready-Reserve employees differed significantly as to which jobs they preferred. (Doc. 112 at 15 n.11).

In sum, even taking Freeman's allegations as true, he has not shown that he suffered an adverse employment action based on job assignments.

### c.    Freeman's 2013 Suspension

Delta does not dispute that Freeman's approximately two-week long suspension without pay in the fall of 2013 during the investigation into the complaints that Delta received about Freeman's alleged mistreatment of Michelle Race constitutes an adverse employment action.

Rather, Delta first argues that Freeman has not established a prima face case because he has not shown that any similarly situated white employee was treated more favorably under similar circumstances. Freeman wholly fails to address this argument. And, he has not identified any white Delta employee who was alleged to have engaged in mistreatment of a co-worker and was treated better.

Delta also argues that Freeman has not shown that Delta's investigation and his suspension was a pretext for discrimination. Freeman argues that Jones and Kuhn had expressed distaste for interracial relationships, and specifically Freeman's relationship with Race. Even accepting that testimony as true, Freeman has not shown that Delta's handling of this investigation and his suspension was pretextual.

It is not disputed that the investigation was triggered by an anonymous email to Jones from Ready-Reserve employees who stated that Freeman was mistreating Race at work, stealing her buddy passes, and forcing her to work shifts for him. (Doc. 73-1 at 94-95). Importantly, Freeman does not allege, nor is there any evidence, that this email was somehow fabricated or instigated by Delta as an excuse to investigate or suspend Freeman. Nor does Freeman contend that it would have been appropriate for Delta to ignore allegations of mistreatment of an employee by a co-worker.

Delta interviewed both Freeman and Race. Freeman denied the allegations and he continued working. It was only after Race provided a statement confirming that the allegations were true that Freeman was suspended pending completion of the investigation.

Jones also received reports from Nicole Lackey that Freeman mistreated Race, although Lackey would later testify that she made the report at Jones' request. This is immaterial, however, because once Race recanted her statements that Freeman mistreated her, Delta ended the investigation and returned Freeman to work. (Kuhn Dep. 60; Jones Dep. 122).

Freeman has thus not raised a triable issue as to whether Delta's reason for suspending him temporarily in 2013 was a pretext for race discrimination.

### d.    Freeman's Termination

In order to raise a prima facie case of race discrimination as to his termination, Freeman must show that he was replaced by a person outside of the protected class or that a similarly situated person outside the class was treated more favorably. Freeman makes no allegations regarding his replacement.

On the similarly situated issue, Delta has produced evidence that, from 2011 to

2015, Delta terminated 13 employees (including Freeman) for violating the Delta non-revenue travel policy by checking a bag and not traveling with it. (Doc. 105 at 67-68). Of these employees, 2 were African American; 4 were white; 1 was Hispanic; 3 were Asian; and 2 were multi-racial. (*Id*.).

Freeman states in his memorandum in opposition that white employees at CVG were merely counseled for "pass abuse" while Freeman was terminated. (Doc. 128 at 16). This mischaracterizes the record and raises no issue of fact.

It is not disputed that the term "pass abuse" is a broad term at Delta which encompasses a variety of violations, some of which lead to termination in the first instance and some which do not. (Shaw Dep. 159-60). The documents that Freeman cites in his brief pertain to employees who were disciplined for *other* types of "pass abuse," such as bartering buddy passes and allowing others to use their Delta passwords to access buddy passes. (Doc. 105 at 69, 75). They do not reflect employees who engaged in the same violation as that for which Freeman was terminated: checking a bag without the intent to fly.

As noted, Delta has produced evidence that all employees, of various races, who committed that violation during the relevant period were terminated. Freeman has produced nothing to show that this evidence is inaccurate.

Further, even if Freeman had established a prima facie case of race discrimination, he has not raised a triable issue of pretext. Freeman devotes only two pages of his memorandum in opposition to his termination claim, focusing exclusively on the alleged racial animus that Jones and Kuhn harbored, and arguing that a triable issue exists under the "cat's paw" theory of liability. (Doc. 128 at 30-31).

This argument ignores several undisputed facts. First, it is entirely undisputed that

Kuhn was not involved *at all* in the investigation of the 2014 bag incident or in Freeman's termination. (Kuhn Depo. 32-34).

As to Jones, it is likewise undisputed that he relied on what Unkraut and Martinez reported to him after they interviewed Freeman in making the initial recommendation that Freeman's employment be terminated. (Doc. 105 at 62). That recommendation was then independently reviewed by Delta's Human Resources officials in Atlanta, to whom Freeman attributes no racial animus, and Jones had no further involvement. (Shaw Dep. 119-126).

Barbara Shaw reviewed the witness statements, including Freeman's statement in which he stated that he was "sending a bag two days before" he was scheduled to fly, as well as Martinez's statement that Freeman admitted that he did not intend to travel. (*Id.*) Shaw testified that these statements led her to conclude that Freeman had indeed violated the policy against checking a bag without the intent to fly. (*Id.*).

Thus, even assuming that Jones harbored some racial animus because of his alleged comments to Race about interracial relationships, Freeman has not shown the necessary connection between those statements and his termination. *See Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 429 (6th Cir. 2014) (affirming summary judgment for employer because there was no evidence that person with decision making power harbored racial animus).[18]

Several other points should be mentioned. First, Freeman states that he "testified that he never spoke" to Martinez about the bag incident. (Doc. 128 at 31). The record contains no such testimony. Freeman was asked in his deposition about being questioned

---

[18] This same analysis applies when considering the "mixed motive" method of proof. *Id.*

on April 23, 2014 about checking the bag, and he testified that he recalled speaking with Unkraut, but there is no testimony denying that Martinez also was present. (Freeman Dep. 138-39).

Next, Freeman states that Jones "deliberately omitted" the statement of Debbie Coffman from the investigation. This likewise misrepresents the record. First, Jones testified that he did not take any statement from Coffman, who was in Atlanta, and that he believed HR in Atlanta handled that side of the investigation. (Jones Dep. 125-26).

Second, Shaw testified that Coffman's statement was, in fact, in the file that she was given when she reviewed the termination recommendation. (Shaw Dep. 127-28). Shaw further testified that Coffman's statement did not alter her determination that termination was appropriate because the other evidence still suggested that Freeman did not really intend to fly and that carrying a bag for another person also violates TSA security rules. (*Id.*).

Finally, it is undisputed that when Freeman was confronted by Unkraut and Martinez about the situation with the checked bag, he did not mention to them that he had arranged for Vincent to cover his shift. (Freeman Depo. 146-47). He also never mentioned until his deposition in this case the alleged "two days/two hours" mistake in the written statement he gave that evening explaining what happened.

Under the modified "honest belief" rule applied by the Sixth Circuit, there is no showing of pretext where the employer establishes "its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (citation omitted). In so determining, "we do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Id.* "Rather, the key inquiry is whether the

employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*[19]

This principle applies here and precludes a finding of pretext. Unkraut and Martinez gave Freeman the opportunity to explain what happened; he gave a written statement stating that he checked the bag two days before he intended to fly because his friend needed her personal items sooner, and that he had not packed the bag; and the termination recommendation was reviewed by independent HR staff in Atlanta. The undisputed evidence is thus that Delta made a "reasonably informed and considered decision before taking its adverse employment action." *Id.*

Defendants are thus entitled to summary judgment on this claim.

### 3.    Hostile Work Environment

Construing the evidence in Freeman's favor, it does not approach the level required to raise a triable issue as to an actionable hostile work environment based on race.

The extent of Freeman's testimony on this claim is as follows:

\*    Defendant Howe called him "Slick," which Freeman told him he did not like;

\*    Defendant Gosney was "moody" and once slammed a door in his face;

\*    Defendant Unkraut was "condescending" and seemed not to want to help;

\*    Plaintiff Lackey told Freeman about a sign regarding co-worker David Perdue which offended her, but at his deposition, Freeman could not recall what it depicted.

---

[19] Freeman's memorandum in opposition also asserts that the record contains "direct" evidence that race was the reason for his termination. (Doc. 128 at 35-36). It does not. There is no evidence that any decisionmaker referenced or alluded to Freeman's race in connection with the decision to fire him, and his reliance on *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642 (6th Cir. 2012), is therefore misplaced. In that case, defendant's decisionmaker directly referenced plaintiff's race as the reason she was to be fired. *Id.* at 650. This record contains no such evidence.

Freeman also testified that he never heard any manager use any racially derogatory term (Freeman Dep. 107), but that Race told him some managers disapproved of their interracial relationship. (*Id.* at 118).

Other than Race relating to Freeman the alleged disapproval by some managers of their relationship, none of the above items is "based on race" in any way. No one used racial slurs in Freeman's presence. He has not shown that above evidence rises to the level required under Sixth Circuit caselaw to show a hostile environment, nor did Freeman testify that any of the above interfered with his ability to do his job.

This claim thus also fails as a matter of law.

### 4. Retaliation

Freeman's last claim is for retaliation. The protected activity on which this claim is based is his October 7, 2013 email to a Regional VP complaining that the investigation into the allegations that he was mistreating Michelle Race had "a deep undertone of racism."

The problem with this claim is that there is no evidence that anyone involved in decision to terminate Freeman's employment the following April had any knowledge of this email. Neither West, nor the field EEO officer who responded to the email, were involved in the decisionmaking process related to Freeman's termination.

A prima facie case of retaliation requires the plaintiff to show that "his exercise of such protected activity was known" by those who took the adverse action against him. *Wingo v. Mich. Bell Tel. Co.*, 815 F. App'x 43, 46 (6th Cir. 2020). "This requires proof, even at the prima facie stage, that the unlawful retaliation would not have occurred but for [plaintiff's] protected activity." *Id.* (citation omitted).

The record simply contains no evidence that would give rise to a prima facie case

of retaliation. Defendants are thus entitled to summary judgment on this claim as well.

Therefore, having reviewed this matter and the Court being advised,

**IT IS ORDERED** that defendants' motions for summary judgment on the claims of plaintiff Brandon Freeman (Docs. 108, 112, 116) be, and are hereby, **GRANTED**.

This 21st day of June 2021.

Signed By:

*William O. Bertelsman* WOB

United States District Judge